## WILSON v. DAVIS.

### Opinion delivered March 31, 1919.

1. CONSPIRACY—SUFFICIENCY OF EVIDENCE.—A conspiracy may be inferred, although no actual meeting of the parties is proved, if it be shown that two or more persons pursued by their acts the same unlawful object, each doing a part, so that their acts, though apparently independent, were in fact connected.

2. SAME—AGREEMENT TO DEFRAUD—LIABILITY OF CONSPIRATORS.— Where an unlawful agreement is entered into, the parties become liable as joint tort-feasors to the extent of the damage done as a result of the conspiracy, and the liability of a particular conspirator does not depend upon the extent to which he profited or his activity in promoting the conspiracy.

3. BANKS AND BANKING—ULTRA VIRES ACT—ESTOPPEL.—Where a bank accepts the benefit of an unauthorized act of its president, it can not complain that the act was *ultra vires*.

4. CONSPIRACY—FRAUD—EVIDENCE.—Finding that a mortgagee entered into a conspiracy with the mortgagor and with the president of a bank which had assumed the mortgage by negotiating the note which had been paid by the bank and by the mortgagee

accepting as bonus bank assets without the knowledge of the directors, *held* not against the preponderance of the evidence.

5. CONSPIRACY—INDORSEMENT OF PAID NOTE.—Where a bank assumed a mortgage and paid one of the mortgage notes, and thereafter the president and original mortgagor, with intent to divert to their own use funds of the bank, erased the "paid" mark from the note and secured the mortgagee's indorsement on the note for the purpose of circulation, the mortgagee became a tort-feasor and became liable to the bank to the extent of its damage.

Appeal from Benton Chancery Court; *B. F. McMahan,* Chancellor; modified and affirmed.

*Holloway & Holloway,* for appellant.

1. The payment of the bonus was not *ultra vires,* and the court erred in so holding. There was no testimony that the bank through its officers exceeded its charter powers in paying the $3,100 bonus. The bank had the power to expend this sum to preserve its assets and protect its securities and a debt due to the bank. And it had the power to acquire by purchase the Texas ranch and cattle. Act No. 113, Acts 1913, § 29; 5 Cyc. 492. As it acquired title to the ranch and cattle subject to the incumbrance held by appellant, it became liable for the payment of the principal and interest of the notes held by appellant, and it was the bank's privilege and lawful right to bring about a change in the person of the mortgagee, in order to bring the incumbrance into friendly hands and reduce its interest liability to 6 per cent. Therefore the payment of the bonus was a benefit to the bank and it can not recover, regardless of the charter powers of the bank. It could not accept the benefits of an *ultra vires* act and at the same time avoid the burdens. 91 Ark. 367; 96 *Id.* 594.

2. The bank was not defrauded in the transaction with the Mississippi Valley Trust Company, but if Talley and Felker perpetrated a fraud, which is not conceded, appellant did not participate in the fraud so as to become liable therefor. The testimony shows conclusively that appellant had no connection with the arrangement with the trust company to take up and carry the

notes, and had no knowledge of such arrangement, but if he had endorsed the notes to the trust company that was no fraud on the Bank of Rogers. There is no evidence of fraud or conspiracy. The burden was on appellee to show fraud. 3 Cyc. of Ev. 415; 92 Ark. 586. The decree should be reversed and the cross-bill dismissed.

*Moore, Smith; Moore & Trieber* and *Duty & Duty,* for appellee.

1. The bank was defrauded out of $3,100, the bonus paid Wilson, and appellant clearly promoted the fraud and was a co-conspirator in the fraud. The conspiracy was proven by circumstances if not by direct evidence. 98 Ark. 575; 98 *Id.* 609; 77 *Id.* 444; 95 S. W. 477. See also 98 Ark. 975; 20 *Id.* 216; 59 *Id.* 422; Am. Ann. Cases 1918, p. 459; 5 R. C. L. 1061, 1091; Words & Phrases (2 Series), 1910; 20 Ark. 216.

2. A recovery may be had against two or more conspirators, if the charge is sustained against one, since damage and not the conspiracy is the gist of the action. Am. Ann. Cases 1917 E, 1022; 169 Fed. 259; 79 Conn. 414; 48 S. W. 429.

3. After the conspiracy is established, whatever is done in pursuance thereof by one is the act of all. 5 R. C. L. 1093; 176 Ill. 608; 68 Am. St. 203; Note 6, L. R. A. 630. This is true irrespective of the fact that they do not actually participate therein or to the extent to which they benefit thereby. 209 Ill. 159; 103 Wis. 125.

4. Every person entering into the conspiracy is in law deemed a party to all acts done by any of them in furtherance of the common design. 5 R. C. L. 1093; 77 Vt. 294; 60 Atl. 74; 107 Am. St. 765.

5. The bank was defrauded by the payment of the bonus of $3,100 and in addition thereto of interest. Where an officer of a bank takes a portion of its assets or funds and misappropriates them the bank can sue for and recover from the party who receives them with knowledge. 105 Mo. App. 463; 79 S. W. 1177. Where an agent of a bank certifies a check which he issues

whereby the funds of the bank may be withdrawn for his benefit, the person receiving the check in order to give it validity is bound to make inquiry of other officers as to its validity.    47 Ore. 562; 85 Pac. 81; 6 L. R. A. (N. S.), 365.

6.    Where a contract is manifestly *ultra vires* as here, there can be no enforcement thereof, yet the party benefited can be compelled to return the property or money received.    103 U. S. 99; 98 *Id.* 640; 77 Fed. 85; 25 *Id.* 812.

7.    Under all the circumstances in the record the chancellor was correct in holding that the payment of $3,100 to Wilson was an *ultra vires* and fraudulent transfer of the money of the bank to him and that the negotiation of the notes to the trust company for $10,000 was a fraud upon the bank and participated in by appellant to such an extent as to render him liable in an action for civil conspiracy.    The decree should be affirmed, even if based on an erroneous conclusion of fact.    55 Ark. 112; 170 *Id.* 304; 85 *Id.* 1; 86 *Id.* 140.

SMITH, J.    The Bank of Rogers was incorporated in 1912, with a capital stock of $150,000, and in the latter part of that year was sold to W. E. Talley and his associates by W. R. Felker, who owned the bank and operated it as a private banking institution before its incorporation and who owned most of its stock after its incorporation.    At the time of this sale Felker was personally indebted to the bank to the extent of about $85,000 and was also obligated to the bank as endorser on a large amount of paper held by the bank.

Prior to the month of July, 1913, Felker was the owner of a large cattle ranch situated in Texas, and J. B. Wilson, the appellant herein, held a mortgage on this ranch and the cattle thereon to secure a loan of $40,000 made by Wilson to Felker, the loan being evidenced by four notes, each for the sum of $10,000, and bearing interest at the rate of 8½ per cent. per annum, payable, respectively, in the years 1913, 1914, 1915 and 1916.

After Talley and his associates had purchased the bank from Felker, the bank began to press Felker for the

payment of his indebtedness to it, whereupon Felker sold the ranch and the cattle thereon to the bank for the consideration of about $129,000. The sale was, of course, subject to Wilson's mortgage, the payment of which was assumed by the bank as a part of the purchase price. The balance of the purchase price was evidenced by two certificates of deposit in the sum of $5,000 each which were issued to Felker, who immediately negotiated them to appellant Wilson. Shortly after this transaction was closed the bank sold a large number of calves off the ranch for something over $18,000, and out of the proceeds of this sale paid to the appellant Wilson one of the $10,000 notes. This note was marked ''paid'' by Wilson and surrendered by him to the bank.

The bank closed its doors on July 6, 1914, and appellant Wilson filed with the Bank Commissioner for allowance the two certificates of deposit of $5,000 each, which Wilson had acquired from Felker. The liability of the bank on these certificates is not questioned; but Wilson and Talley were made defendants in a cross-bill filed by the Bank Commissioner in which judgment was prayed against them for an alleged wrongful conversion of certain funds of the bank. The facts on which this cross-action was based will fully appear from the further statement of the points at issue.

A statement of other facts essential to an understanding of the points at issue appear in the findings of fact made by the court below (and which we think the testimony supports), from which we copy as follows:

''The court finds that immediately after said purchase the said Bank of Rogers paid to the said Wilson ten thousand dollars of said indebtedness, leaving thirty thousand dollars due the said J. B. Wilson, and that thereafter the said W. E. Talley made an arrangement with the Mississippi Valley Trust Company of St. Louis, Missouri, whereby it took up said indebtedness to said J. B. Wilson and that at the said time the said indebtedness to said Wilson as aforesaid was not due, but in order to perfect the arrangement with the Mississippi Valley

Trust Company, whereby the said company was to carry the loan of thirty thousand dollars belonging to the said J. B. Wilson, and in order to induce the said J. B. Wilson to agree to said contract made by the said W. E. Talley with the Mississippi Valley Trust Company and to permit the Mississippi Valley Trust Company to take up and carry said indebtedness, the said J. B. Wilson required and exacted from the said Bank of Rogers a bonus of thirty-one hundred dollars and that the said W. E. Talley without any authority, authorization or without the knowledge or consent of the board of directors of the Bank of Rogers, took said thirty-one hundred dollars out of the assets of the Bank of Rogers and turned the same over to the said J. B. Wilson as a settlement of said bonus and that the said transaction was well known to the said J. B. Wilson, which act of the said W. E. Talley the court finds to be *ultra vires* and void and that said Bank of Rogers received no consideration for said thirty-one hundred dollars as aforesaid, which was well known to said Wilson and that said J. B. Wilson was a party to said transaction which amounted to a fraud against the creditors and stockholders of said Bank of Rogers.

"The court further finds that on or about the 3d day of November, 1913, that the cross-defendant J. B. Wilson was the holder of forty thousand dollars in promissory notes executed to him by W. R. Felker, the same being and including the thirty thousand dollars notes as above set forth and that all of said promissory notes were secured by a mortgage on lands, leaseholds and cattle situated in Mitchell, Howard and Sterling Counties, Texas. That said mortgage was dated December 18, 1911, and of record in said counties and that on or about the said date W. R. Felker was the owner of said lands, leaseholds and cattle and that on or about said date he sold said properties to the Bank of Rogers, the said Bank of Rogers assuming and agreeing to pay the said forty thousand dollars due to the said J. B. Wilson and that at the time the said W. E. Talley was president

of the Bank of Rogers and that W. R. Felker was vice president of the Bank of Rogers and that said J. E. Felker was cashier of said institution.

"The court further finds that on or about said date or soon thereafter, that said W. E. Talley and J. E. Felker, and by and with the consent of the said J. B. Wilson, the holders of said mortgage, sold and disposed of ten thousand dollars worth of the cattle on said real estate in said counties, in the State of Texas, and that said ten thousand dollars received from the proceeds from said sale were turned over to said J. B. Wilson in payment of one promissory note, the same being one of a series of four notes of ten thousand dollars each, amounting to the said forty thousand dollars indebtedness, which said J. B. Wilson held against said properties as above found.

"The court further finds that upon the payment of the said ten thousand dollars note that same was canceled and marked 'paid' by the said J. B. Wilson and sent to the Bank of Rogers, but that shortly thereafter a fraudulent scheme was entered into by and between the said J. B. Wilson, W. E. Talley and J. E. Felker, whereby the Bank of Rogers could be defrauded out of the sum of ten thousand dollars and that the said W. E. Talley returned said note to J. B. Wilson and that W. E. Talley then entered into a contract with the Mississippi Valley Trust Company, a banking corporation located in the city of St. Louis and State of Missouri, and arranged with the said Mississippi Valley Trust Company, whereby said trust company should take over the entire forty thousand dollars notes which were formerly secured by mortgages on said Texas property, which at that time belonged to the Bank of Rogers and that the said J. B. Wilson, J. E. Felker and W. E. Talley conspired together to falsely Texas property had been paid and that the indebtedness to the said Mississippi Valley Trust Company that none of said forty thousand dollars indebtedness against said and fraudulently represent and did falsely misrepresent amounted to forty thousand dollars, of which thirty thou-

sand dollars was held by the said J. B. Wilson and that the ten thousand dollar note which had been paid to said Wilson by the Bank of Rogers as aforesaid was not in fact paid, but was owned and held by J. E. Felker and W. E. Talley, said representations being made by the said Wilson, Talley and Felker with full intent of defrauding the Bank of Rogers out of its ten thousand dollars, which it had paid to the said J. B. Wilson.

"The court further finds that acting upon said representations the said Mississippi Valley Trust Company entered into a contract with said Wilson, Talley and Felker whereby it took said forty thousand dollars worth of notes and paid to the said Wilson the sum of thirty thousand and the said J. E. Felker and W. E. Talley the sum of ten thousand dollars, which they had represented as aforesaid, to be due the said W. E. Talley and J. E. Felker on the said ten thousand dollar note, which had in fact been paid by the Bank of Rogers and which at said time was not due and payable to any one. And did unlawfully and fraudulently erase said 'paid' mark from said note and said Wilson did unlawfully and fraudulently endorse and assign same to the Mississippi Valley Trust Company.

"The court finds that the said ten thousand dollars received on said note was fraudulently appropriated to the personal use and benefit of the said W. E. Talley and J. E. Felker and that the said J. B. Wilson assigned, aided and abetted in the misappropriation of said funds belonging to said bank as aforesaid with the intent then and there to cheat and defraud the said bank out of said sum of ten thousand dollars.

"The court finds further that thereafter the Mississippi Valley Trust Company foreclosed its mortgage on said Texas property owned by the said Bank of Rogers and on which said forty thousand dollar mortgage existed and that thereby the said Bank of Rogers was forced to and did pay the said ten thousand dollars in notes a second time and that said Bank of Rogers received no benefit whatever from the transaction with the said J. B. Wilson

and the said Mississippi Valley Trust Company, wherein it lost said ten thousand dollars, but that the said ten thousand dollars went for the personal use and benefit of said Talley and Felker.''

Upon these findings of fact it was by the court directed that the Bank Commissioner have judgment for the use and benefit of the Bank of Rogers for the sum of $13,100 against the cross-defendants, J. B. Wilson and W. E. Talley, and that said judgment be offset to the extent of $10,412.32, the amount of the certificates of deposit which Wilson had purchased from Felker and had filed for allowance by the Bank Commissioner with the interest thereon, and judgment over was rendered against Wilson and Talley for the net sum of $2,687.68, together with interest thereon at the rate of six per cent. from November 4, 1913.

We have copied the somewhat lengthy findings of fact because, as is stated in appellant's brief, the questions involved are principally questions of fact; and it is not only insisted that the testimony does not support the findings made, but it is also insisted that the findings do not support the decree rendered.

Appellant's brief is devoted to a discussion of three questions, which may be consolidated into a single question and stated as follows: Did Felker and Talley conspire together to defraud the bank, and, if so, did Wilson participate in this conspiracy to such an extent as to deny him the right to recover as against the bank any portion of the money lost by the bank as a result of the conspiracy? Before discussing the questions of fact stated we announce the propositions of law applicable to the issues and which are applied by us in arriving at our conclusions.

In the case of *Parker* v. *State*, 93 Ark. 575, this court said: "In the case of *Chapline* v. *State*, 77 Ark. 444, it is held that a conspiracy may be inferred, although no actual meeting among the parties is proved, if it be shown by the testimony that two or more persons pursued by their acts the same unlawful object, each do-

ing a part, so that their acts, though apparently independent, were in fact connected; and in the same case it is held that any act done or declaration made by one of the conspirators in furtherance or perpetration of the alleged conspiracy may be shown as evidence against his fellow-conspirators."

If such an unlawful agreement exists the parties thereto become liable as joint tort feasors and to the extent of the damage done as a result of the conspiracy, and the liability of a particular conspirator does not depend upon the extent to which he profited by the conspiracy or his activity in its promotion. *National Fire Proofing Co.* v. *Masons Bldg. Assn.,* 169 Fed. 259; *Kimball* v. *Harman,* 34 Md. 407; *Wyeman* v. *Deady,* 79 Conn. 414.

The agreement under which the Bank of Rogers became indebted to the Mississippi Valley Trust Company was evidenced by a writing dated November 3, 1913, and it clearly appears that the contract was not entered into for the benefit of the bank. We do not set out this contract because of its length, but it begins with a recital that, "The Ozark Land & Lumber Company (a concern owned by Felker), W. R. Felker, J. E. Felker and the Bank of Rogers, Rogers, Arkansas, are indebted to you (the trust company) in the sum of $45,000 and accrued interest as evidenced by their notes for said amount due on demand and secured by the pledge of a certain fund in your bank as trustee under a second mortgage of the Ozark Land & Lumber Company dated January 2, 1912." This statement was not correct, as the bank was not indebted to the trust company and only became indebted to it by the execution of the contract containing the recital just set out. Talley testified that no advantage to the bank was contemplated, and when asked why the contract was executed in the name of the bank stated that it was "a daylight hold-up." Paragraph 3 of this writing recites that "the undersigned, W. E. Talley and J. E. Felker (a son of W. R. Felker) are the owners of the remaining $10,000 note described in paragraph 2 above. (This is the note involved in this litigation)." It is not

denied that this statement was known to be false when it was written, as neither Talley nor Felker owned this note or any interest in it. Neither is it denied that this note had been paid to Wilson and had been marked paid and that, after it had been paid, Wilson mailed it to the Bank of Rogers which had paid it. Nor is it denied that after this note had been paid it was resurrected and the word "paid" erased and the note endorsed by Wilson without recourse. This was done for the admitted purpose of putting a paid and canceled note again in circulation and was done only after Talley and Felker and a representative of the trust company had called on Wilson at his home for the purpose of conferring with him in regard to the transaction. Wilson admits that he consented to do this only after he had been paid the bonus of $3,100 in the form of a draft drawn on the Bank of Rogers, which was paid out of the funds of that institution. Wilson denied, however, that he had knowledge of or was a party to any agreement that was calculated or intended to defraud the bank out of any sum of money, and he denied that he had profited to any extent by the agreement made with the trust company. But, when asked if he had made any inquiry about the effect of the agreement made with the trust company, he answered that he did not care so long as he received the money due him and the bonus.

Appellant earnestly insists that no fraud was practiced or intended on the bank itself but that the contract with the trust company was made for and inured to the benefit of the bank. The correctness of this contention appears to be the controlling question in the case, for however credulous and passive Wilson may have been, resulting from his confidence in Talley and Felker, we think the court below was warranted in finding that Wilson was in possession of facts which charged him with notice of what Talley and Felker were doing. As has been stated, the trust company sent its representative to confer with Wilson before the execution of the agreement which resulted in the reissuance of the $10,000 note. And it is undisputed that the deal would never

have been put through but for Wilson's endorsement of the previously paid note for the purpose of again putting it in circulation. This mortgage indebtedness was not paid, and when the bank closed its doors on July 6, 1914, the mortgage was foreclosed and the bank lost its valuable equity in the ranch in addition to the $10,000 note which it had previously paid.

It is insisted, however, that if the bank had not assumed the debt due the trust company Felker would have been thrown into bankruptcy and the sale of the ranch to the bank would thereupon have been set aside. There is no testimony, however, that this would have been done, or could have been done, as there is no showing that Felker was insolvent. ·

It is also argued that if the bank had not raised and used the money borrowed from the trust company it would have been compelled to use other assets belonging to it. But $15,000 of the $45,000 indebtedness which the bank assumed was not its debt. The bank itself owed no part of the debt to the trust company prior to its assumption of it, although its ranch was subject to the mortgage for $30,000 which was included in the $45,000 debt to the trust·company which the bank assumed. The written contract with the trust company recites that the indebtedness there secured was the indebtedness of the Ozark Land & Lumber Company, Felker and the bank, but no contention is made that the bank was liable to the trust company in any sum prior to the execution of the contract which was evidenced by the writing which recited the existence of the obligation. The beneficiaries of the whole transaction were Felker and the Ozark Land & Lumber Company, which desired assistance to complete five miles of a railroad which it had under construction at the time, and the net result of the whole transaction is that Talley was using both the credit of the bank and its assets, represented by a note for $10,000 which had been previously paid, for the benefit of another corporation.

To the argument that Wilson derived no profit or advantage from the bonus paid him, and that the bank

sustained no loss, in that, paper bearing 8½ per cent. was exchanged for paper bearing 6 per cent., we quote the following answer from appellee's brief:

"A contract with the Mississippi Valley Trust Company provided for an interest rate of six per cent. Now let us see if the bank lost or gained, as the appellant seems to think. If they had let the notes remain in the hands of the appellant, the first ten thousand dollar note at maturity, December, 1914, would have produced interest at eight and a half per cent. for one year, or eight hundred and fifty dollars. The second ten thousand dollar note for two years, or until December, 1915, at eight and a half per cent. would have produced seventeen hundred dollars. The third ten thousand dollar note at eight and a half per cent. for three years, or until the date of maturity, December, 1916, would have produced twenty-five hundred and fifty dollars interest, or the total interest would have amounted to fifty-one hundred dollars at the maturity of the notes.

"Now under the arrangements with the appellant and the Mississippi Valley Trust Company, what was the Bank of Rogers actually out in interest, together with the thirty-one hundred dollar bonus for the same length of time? The figures show as follows:

Interest on $10,000 note, 6 per cent., for one year......$ 600
Interest on $10,000 note, 6 per cent., for two years... 1,200
Interest on $10,000 note, 6 per cent., for three years 1,800

Total interest at 6 per cent.................................................$3,600
Bonus paid appellant................................................................ 3,100

Making a total cost to the Bank of Rogers of.............$6,700
Total the bank was actually out in interest and
    bonus...................................................................................... 6,700
Total the bank would have been out if the contract
    with Wilson and Mississippi Valley Trust
    Company had not been made......................................... 5,100

Lost to Bank of Rogers by transfer...........................$1,600

"It seems to us that this is sufficient answer to the appellant's assertion that the Bank of Rogers gained by the payment of the bonus of thirty-one hundred dollars."

It is finally insisted by appellant that the bank had the right to expend its assets to preserve its securities and that whether Talley was authorized or not to make the deal, out of which this litigation arose, the trade was made for and has accrued to the benefit of the bank and that having accepted the benefit of an act *ultra vires,* the bank can not now complain. Counsel for appellee find no fault with the law as thus stated; nor do we; but we agree with them that the facts as found by the chancellor, as well as by a majority of this court, do not warrant an application of the principle announced. The thirty-one hundred dollars was not only used without the knowledge or consent of the directors of the bank, but it was not used to preserve the assets of the bank or to protect its securities. The indebtedness was not even placed in more friendly hands, as urged by counsel for appellant, than it was with Mr. Wilson, for it appears that before the paper all matured the trust company immediately proceeded to foreclose its mortgage and to sell all the interest that the bank had in the Texas property.

Upon a consideration of the testimony as a whole we are of the opinion that the findings of the court set out above are not clearly against the preponderance of the evidence, except that instead of sustaining a loss of $3,100 on account of the bonus the net loss on that account was only $1,600 as shown by appellee's own figures set out above, and Wilson should not be charged on this account with a greater loss than the bank sustained. The decree of the court will, therefore, be modified by reducing the judgment $1,500, and as thus modified, will be affirmed.

SMITH, J., (on rehearing). In the lengthy petition for rehearing which is filed in this case attention is called to several inaccuracies in the finding of fact made by the court below, which was adopted by us. There was certain confusion of facts in the briefs which we sought to

avoid in the opinion, and for this purpose we copied into
the opinion the somewhat lengthy finding made by the
court below.   Some of these inaccuracies to which atten-
tion is now called are unimporant, while attention to
others was not called in the original briefs.   But the mo-
tion for rehearing does challenge our approval of the
chancellor's finding that Wilson so far participated in
the conspiracy as to become liable for its consequences
upon the ground that if there was in fact a conspiracy to
divert the assets of the bank to uses other than those of
the bank, Wilson was neither aware of nor party to that
purpose and that no competent testimony sustains the
finding of the chancellor which we have approved.   This
insistence is made with such earnestness and apparent
assurance that we are constrained to notice some of the
statements contained in the petition for rehearing.

Appellant's argument assumes as true the very point
at issue, and that is that Wilson was no party to the
scheme to divert the bank's assets to uses other than its
own by putting again in circulation notes for ten thou-
sand dollars which the bank had already paid and which
it has since paid the second time.   The chancellor made
no finding, nor do we, that Wilson was a party to the va-
rious machinations of Talley and Felker which wrecked
the bank except as to the ten thousand dollar item.   Nor
was it necessary to find that Wilson appreciated the ex-
tent to which Talley and Felker were misusing the funds
of the bank.   The question here involved is, Did Wilson
know that they were about to misuse this ten thousand
dollar note, and did he participate in that misuse?   It
seems clear to a majority of the court that every one
connected with this transaction realized that it was out of
the ordinary and that it was one which could by no pos-
sibility result in profit to the bank.   Felker testified that
during the negotiations leading up to the transaction he
spent several days at Wilson's home, during which time
the transaction was frequently discussed; and Lackey,
representing the trust company, also made a trip to Wil-
son's home for the purpose of discussing the transaction

with him.  We think the inference fairly follows that
Wilson knew what was about to be done.

It is said in the petition for rehearing that Wilson
did not send the note to the bank but that he sent it to
Felker, the maker, and that he had not marked it paid
before doing so.  But on page 83 of appellant's original
brief in the statement of facts there contained the follow-
ing admission appears: "Later on the bank, acting
through some of its representatives, sold approximately
eleven hundred calves off the Texas cattle ranch for
eighteen thousand or twenty thousand dollars, and of the
proceeds of that sale the sum of ten thousand dollars and
accrued interest on two five thousand dollar notes was
paid to the appellant, Mr. Wilson, and two notes so paid
were marked 'Paid' on their face and surrendered by Mr.
Wilson to the Bank of Rogers."  The testimony sustains
this admission.

It is also now insisted that Wilson did not endorse
the note "without recourse" after having marked it paid.
But it is not denied that this endorsement was made and
by virtue thereof it was again put in circulation as the
property of Talley and Felker when it had been pre-
viously paid by the bank, and by the transaction which
again put it in circulation the bank assumed and became
responsible for its payment again, and because of this
transaction did later pay it the second time.  As the
payee in the note, Wilson alone had the right to endorse
it, and no charge of forgery is contained anywhere in
the briefs.  Indeed, it is argued that it was a perfectly
innocent thing for Wilson to have endorsed the note, if
he did, as the bank would have been compelled to use
other assets if it had not used the particular note.  But
there is the crux of the case.  It is no excuse for Wilson
to say that Talley and Felker were going to wreck the
bank anyway.  The question is, if Wilson did endorse
this note for the purpose of putting it in circulation
after it had been paid by the bank and after he had
marked it paid, did he do so with knowledge of the fact
that by this device Talley and Felker were about to

divert to their own use the funds of the bank? If Wilson did this he became a joint tort-feasor, and, as such, liable to the extent of the damage done as a result of the wrongful act in which he participated.

A number of questions of fact are discussed in the petition for rehearing, a review of which would greatly protract the opinion and practically require it to be rewritten; but we dispose of them all by saying that in our opinion the finding of the chancellor that Talley and Felker had conspired to divert the assets of the bank and that the conspiracy was made effective by Wilson's participation therein, is not clearly against the preponderance of the evidence, and, if this be true, it is unimportant to discuss the evidence in further detail.

McCULLOCH, C. J., (dissenting). The only relationship between appellant and the Bank of Rogers was, according to the undisputed evidence, that appellant held notes of W. R. Felker aggregating $30,000, secured by mortgage on a cattle ranch and the cattle thereon situated in Texas, which Felker sold to the Bank of Rogers subject to said mortgage. The notes were to become due in about one, two and three years, respectively, from the date of the transaction now under investigation bearing interest at 8½ per centum per annum from date. It was a part of the plan for Talley and the Felkers, representing themselves and the Bank of Rogers, to get the notes into the hands of the Mississippi Valley Trust Company of St. Louis, to be carried at a lower rate of interest, and they, together with Mr. Lackey, representing the trust company, went to Dallas, where appellant resided, for the sole purpose of inducing appellant to part with the notes. The security was abundant, and appellant declined to assign the notes or to allow them to be paid off unless a satisfactory sum was paid in consideration of a commutation of the unearned interest. Finally the parties agreed on the sum of $3,100 as the consideration to be paid, and this arrangement was consummated. Appellant assigned the notes to the Mississippi Valley

Trust Company and the latter paid to appellant the face of the notes with accrued interest. The $3,100 was paid to appellant by cashier's check on the Bank of Rogers— the payment proceeding through regular channels without anything to indicate secrecy. Now, there was nothing illegitimate about this transaction. The unearned interest on the notes would have amounted to about $5,100, and the security being good, appellant refused to surrender the notes and mortgage unless something was paid him for the loss of the unearned interest. The transaction was not an unusual one, and no charge of fraud can be predicated on it. Talley was in absolute control of the affairs of the bank, and even if there was any question about his authority to carry out this transaction, it was not repudiated by the bank, which continued business for nearly a year after this occurrence.

Passing to the other question in the case of appellant's liability for the $10,000 on the notes which had been paid but which were embraced in the deal between the Mississippi Valley Trust Company on the one side and the Bank of Rogers, the Ozark Land & Lumber Company and the Felkers on the other side: Appellant was not a party to that transaction, either directly or indirectly, and had no interest in it, and was to derive no benefit under it. He merely sold the notes secured by the mortgage on the cattle ranch and cattle in Texas and received compensation for giving up the unearned interest. The contract between the parties named above recited that the Ozark Land & Lumber Company, the Bank of Rogers and the Felkers owed the Mississippi Valley Trust Company $45,000 evidenced by certain notes due on demand, and secured by a mortgage executed by the Ozark Land & Lumber Company, and the agreement was, in substance, that the Trust Company should take up the $30,000 in notes held by appellant, and the other two notes aggregating $10,000 (which the contract recited to be then held by Talley and J. E. Felker), and that Talley and Felker were to pay to the trust company $10,000 to be applied on the aforesaid $45,000 debt, and that the bal-

ance of $35,000 on that debt should be paid by sale of cattle on the Texas ranch (to which sale the trust company was to consent and release the cattle from the mortgage). It was further agreed that the trust company should subsequently make advances out of a certain trust fund to the Ozark Land & Lumber Company to enable it to begin construction of a short line railroad. The net result to be obtained under the contract was that the trust company was to be paid its debt of $45,000 against the Ozark Land & Lumber Company, the Bank of Rogers and the Felkers, and should carry, at six per centum interest, $40,000 in notes against the Texas ranch. The $10,000 paid by the trust company for the notes which had previously been paid to appellant and which the contract recited were held by Talley and J. E. Felker, was to go in part payment of the $45,000 debt, and the balance of $35,000 was to be paid from proceeds of sale of cattle on the Texas ranch. In other words, the trust company was to obtain payment of the Ozark Land & Lumber Company debt of $45,000, but was to carry a debt of $40,000 secured by mortgage on the Texas ranch.

I fail to discover the slightest circumstance connecting appellant with any design to defraud the Bank of Rogers. He concedes that the two notes had been paid and that he had mailed them to J. E. Felker, which occurred on October 23, 1913, about ten days before he assigned the remaining notes to the trust company. The evidence does not show that appellant made any indorsement on the notes after he mailed them to Felker. Not a single witness testified that such was the case and appellant himself testified that he had no recollection when he indorsed the words "without recourse" on the back of the notes. It is undisputed, however, that appellant received no part of the funds paid to the trust company on those notes. All that he received was the amount of the $30,000 in notes then held by him, and the so-called bonus of $3,100. The endorsements are on the notes in appellant's handwriting, but the question is when were they made? They may have been made by appellant when he mailed

the notes to Felker or even before then—no witness pretends to remember about that. But, even if it be conceded that appellant did in fact make the indorsements on those two notes at the time they were delivered to the trust company, he did so at the request of the Felkers and with the approval of Talley, who was acting for the Bank of Rogers. The Bank of Rogers was interested in carrying through the deal with the trust company. It was responsible with the Ozark Land & Lumber Company and the Felkers for the debt of $45,000 to the trust company; and the evidence shows also that it was interested in preventing threatened bankruptcy proceedings by the trust company against W. R. Felker which would nullify the sale of the Texas ranch by Felker to the bank. The bankruptcy proceedings were never instituted, it is true, but, according to the evidence, there was such a threat and it was not carried into execution for the reason that the debt was satisfactorily arranged through the contract now under consideration. Mr. Lackey, the representative of the trust company, insisted on the deal being closed before November 5, 1913, the expiration of the time within which the sale of the ranch could be set aside in bankruptcy as an unlawful preference.

The agreement with the trust company in which the Bank of Rogers, acting through its representative, was a participant, provided that the trust company should have a lien on the Texas ranch for $40,000, and if the two previously paid notes had not been used to make up the required amount, then it would have been necessary for the bank to make it up in some other form—a new note secured by mortgage on the ranch and cattle. The bank was already liable for the debt of the Ozark Land & Lumber Company, which was to be discharged under this arrangement, and it was, therefore, directly interested in the deal. It was represented in the deal by Talley, the president, and if it be conceded that appellant participated to the extent of making a new indorsement on the previously paid notes so as to put them into the hands of the trust company, the transaction was a perfectly le-

gitimate one, for the reason that it was done at the instance of the bank itself.  If any wrong was done to the bank at all it was in making it liable for the obligations of the Ozark Land & Lumber Company, or in unloading on it the Texas ranch, but there is no claim that appellant had any part in either of those transactions.

The decision of the majority is based solely on an unfounded inference that appellant was in league with Talley and the Felkers to use the proceeds of the Bank of Rogers for their own private enterprise, *i. e.,* the promotion of the Ozark Land & Timber Company, but in my opinion there is not even grounds for suspicion, under the proof, that appellant was a party to, or the beneficiary of, those transactions.  He merely looked after his own interest in a perfectly legitimate way in disposing of the immature notes of which he was the owner, and he was not responsible for the misconduct and bad motives of Talley and the Felkers.