OUACHITA VALLEY BANK *v.* PULLEN.

Opinion delivered February 17, 1930.

*Rose, Hemingway, Cantrell & Loughborough,* for appellants.

*Homer T. Rogers, Compere & Compere, Haynie, Parks & Westfall* and *McRae & Tompkins,* for appellees.

BUTLER, J. The following statement is made in the brief of counsel for the appellees: ''The question of law and fact in these two interventions are so nearly similar that they were tried together in the lower court, and this appeal covers both interventions,'' and on this theory counsel for all parties have treated the facts as interchangeable, and applied to each the same principles of law. We think, however, there is an essential and vital difference in the facts established by the evidence regarding the formation and conduct of the Bank of

Smackover from that of the Louann State Bank, that the law governing one has no application to the other, and we therefore deem it necessary to take up and consider the two cases separately.

I. BANK OF SMACKOVER.

The appellant, Ouachita Valley Bank, prior to 1928, had been organized and doing business in the city of Camden, Arkansas, for more than thirty years, its business during that time having been carried on in such manner as to gain general confidence, and to bring in satisfactory dividends to its stockholders. About the year 1922, oil was discovered in what is known as the Smackover Field, and there was a great influx of money into Smackover, and a great need for banking facilities. The Ouachita Valley Bank (hereafter for convenience called Valley Bank) thought first of organizing a branch bank at Smackover, but abandoned this idea when advised that this was not permitted under the laws of the State of Arkansas. However, recognizing the advantages likely to accrue to it from having a bank in Smackover where the deposits of oil men would be large, four of the directors of the Valley Bank, together with a Mr. O. B. Gordon who was not connected with the Valley Bank, organized the Bank of Smackover with a capital stock of $13,000. Three of these directors of the Valley Bank, Mr. Gaughan, Mr. George Gordon and Mr. W. W. Brown each took $3,000, Mr. Bauerlein, another director of the Valley Bank, and also its cashier, subscribed $500, and Mr. O. B. Gordon, who was elected cashier of the Bank of Smackover, subscribed $500.

The Valley Bank advanced the money for the entire capital stock in the following manner. Each of the stockholders of the Bank of Smackover gave his personal note to the Valley Bank payable six months after date, which was renewed from time to time, and the Valley Bank paid into the Bank of Smackover the face value of such notes. Shortly after its organization, the Bank

of Smackover, by some improvident business transaction, became involved to the extent that it was necessary for the stockholders to be assessed 100 per cent. on their stock, for which assessment they gave their notes to the Valley Bank, which bank advanced the money and the business was continued. The organization of the Bank of Smackover was perfected about October, 1922. After the 100 per cent. assessment, the business was continued and proved very profitable, which business was conducted in the following manner. The deposits of the Bank of Smackover, which were large—running from $200,000 to $500,000—were placed by said bank with the Valley Bank, the latter bank paying the former from 2½ to 4 per cent. on daily balances, and its deposits loaned to various corporations, firms and individuals by Mr. W. W. Brown, president of the Valley Bank, and Mr. C. W. Ramsey, active vice president of the Valley Bank. The notes were taken in the name of the Valley Bank, payable at its office, and were then indorsed without recourse to the Bank of Smackover. They were then sent to the Bank of Smackover, entered upon its books according to number, and returned to the Valley Bank for collection. Such of these notes as were not paid were later renewed and made payable directly to the Bank of Smackover, but these transactions were handled by the Valley Bank, as in the first instance, and the renewal notes were sent to the Bank of Smackover for entry upon the books and returned to the Valley Bank where they were kept, all of such notes as were collected being collected by, and at, the Valley Bank.

The deposits in the Bank of Smackover were subject to frequent fluctuation. At times large sums were deposited, and again there were large withdrawals, so that at times the cash reserve of the Bank of Smackover would sink below the reserve required by law. When this occurred, the Valley Bank would send to the Smackover Bank the amount of cash needed to bring

the reserve up to the legal requirement, and it would take in lieu of such advance a sufficient number of the notes belonging to the Bank of Smackover to equal the amount of cash sent, and these notes would then be entered on the books of the Valley Bank as a part of its assets. It was understood that, while nominally the shares of the capital stock of the Bank of Smackover belonged to the incorporators of that bank, they were in reality the property of the Valley Bank. All of the dividends that accrued from the earnings of the Bank of Smackover were applied to the payment of the notes executed to the Valley Bank for the cash that had gone into its capital stock. The board of directors of the Valley Bank, in discussing the affairs of the Bank of Smackover, reached an understanding on a resolution offered by one of the directors that when the earnings of the Bank of Smackover should pay the notes aforesaid, all the earnings of the stock should go to the Valley Bank, and that said bank would stand any losses on the Bank of Smackover:

As we have seen, all of the directors of the Bank of Smackover, except one, were directors of the Valley Bank, and a majority of the directors of the Valley Bank were directors of the Bank of Smackover. At all times after the organization of the Bank of Smackover, until 1928—approximately six years—W. W. Brown was the president of the Valley Bank and also president of the Bank of Smackover. C. W. Ramsey was employed by the Bank of Smackover shortly after its organization and afterward—about July, 1923—entered the employ of the Valley Bank as first assistant to the president, and in 1924 or 1925 became its vice president, he and the president having sole charge of the loan and discount departments of the Valley Bank, making and collecting loans, handling the borrowing of money and the extension of notes. These two gentlemen had exclusive management of the business between the Valley Bank

and the Bank of Smackover. The board of directors of the Valley Bank met usually about once a month, and, when the discussion of the affairs of the Valley Bank was concluded, those directors of the Valley Bank who were also directors of the Bank of Smackover would then take up and discuss the affairs of that bank. Of course, all of these meetings were in the office of the Valley Bank in Camden. The business was conducted in this manner from October, 1922, until the 26th of March, 1928, when the Valley Bank, becoming insolvent, its doors were closed by the Bank Commissioner, causing the Bank of Smackover to fail also.

The facts above stated are practically undisputed. There is some question, however, as to what was the understanding between the Bank of Smackover and the Valley Bank, or Mr. Brown and Mr. Ramsey, its president and vice president, regarding a guarantee of the collection of the notes taken by the Valley Bank for the Bank of Smackover. Ramsey's testimony regarding this is somewhat equivocal as to whether or not it was the distinct agreement between Brown and himself, as president and vice president of the Valley Bank, and the Bank of Smackover, that the payment of all of the notes taken by the Valley Bank was guaranteed, and Mr. Brown testified that he knew of no such arrangement. However, it is undisputed that the assistant bank commissioner, after the organization of the Bank of Smackover, and at the time when the affairs of the Valley Bank were being examined, had a discussion with Mr. Brown relative to the two banks, and the hazard of the oil business, in which conversation Mr. Brown told him that it was the intention to furnish paper from the files of the Valley Bank to the Bank of Smackover, and that he was told that the paper would have to be indorsed without recourse, and Mr. Brown remarked, "Of course, we expected to take care of that"; that afterwards, in 1927, when the examination by the Bank Commissioner

was made of the affairs of the Smackover Bank, no information or data of record could be discovered in that bank, but only dummy notes, and it was ascertained that all of the papers and original notes were in the possession of the Valley Bank; that the representative of the Bank Commissioner then visited Camden, in company with the cashier of the Bank of Smackover, in an effort to ascertain the condition of that bank, and there Mr. Ramsey stated to the representative of the Bank Commissioner that the Ouachita Valley Bank would take care of any loss that the Bank of Smackover might sustain on the notes, and that a notation was made on the report submitted to the Bank Commissioner as follows: "Mr. Ramsey of the Ouachita Valley Bank stated that the Ouachita Valley Bank would take care of all losses on loans"; that this report, with the above indorsement upon it, was transmitted to the directors of the Bank of Smackover, which was examined by them, but the directors testified that they did not discover or notice the memorandum.

The chancery court found, on the facts as above stated, "that the Ouachita Valley Bank pursued a course of conduct in dealing with the Smackover Bank and the Louann Bank that would estop it from disputing liability on any paper involved in these petitions, had no bank failures occurred. The Louann Bank has properly pleaded estoppel. The manner of dealing and handling the paper existed between the Bank of Smackover and the Ouachita Valley Bank over considerable greater length of time. The principles of estoppel would apply even stronger." A master was appointed and directed to find which of the notes exhibited with the interventions were taken direct to the Valley Bank, and by that bank indorsed to the Bank of Smackover or to the Louann Bank with or without recourse; which of the notes were taken direct to the Bank of Smackover, or to the Louann State Bank, as renewals of notes first

mentioned, and by whom such renewals were taken; which notes were taken from the Valley Bank direct to the Bank of Smackover, or to the Louann State Bank, and never entered upon the books of the Valley Bank, but accepted as direct loans by the Bank of Smackover, or by the Louann State Bank, and by what person the said notes were taken, and under what authority; which of the notes had been compromised and settled, and which of the notes had never passed through the Valley Bank but were taken direct by the Bank of Smackover, or by the Louann State Bank.

The master filed a report which has been exhibited by the litigants to this suit as to correct finding and thereupon the court rendered its decree giving judgment against the Valley Bank for the amount of the notes of the following classes:

1. Notes made payable to the Ouachita Valley Bank and assigned by said bank to the Bank of Smackover without recourse.

2. Notes which represented renewals of notes originally taken, payable to the Ouachita Valley Bank, and by it assigned without recourse to the Bank of Smackover, said renewals being taken at the Ouachita Valley Bank and being made payable direct to the Bank of Smackover.

3. Notes taken by the Ouachita Valley Bank by authority of W. W. Brown, president, and C. W. Ramsey, vice president of the Ouachita Valley Bank, payable to the Bank of Smackover; the Ouachita Valley Bank advanced the money to borrowers on these notes and charged the amount to the account of the Bank of Smackover with the Ouachita Valley Bank, and sent the notes to the Bank of Smackover without entering them upon the books of the Ouachita Valley Bank as notes payable to it, and without ever carrying them on its books as assets; and that the amount of the notes of the aforesaid classes, "be credited by the Bank Commissioner in

favor of the Bank of Smackover as a claim against the Ouachita Valley Bank, and that the Bank of Smackover receive upon said claim the same dividends as other creditors."

The court made the same findings and rendered the same judgment as to notes of similar classes in the transactions between the Valley Bank and the Louann State Bank, and decreed that the amount of such be allowed as claims of the Louann State Bank against the Ouachita Valley Bank. From the findings and judgment of the trial court an appeal is brought to this court.

It is insisted by the appellee that there was a specific agreement on the part of President Brown and Vice President Ramsey of the Valley Bank to guarantee the collection of all notes taken for the Bank of Smackover and that Brown and Ramsey had the power to make this contract, while the appellant contends that there was no such agreement ever entered into, and, if there had been, Brown and Ramsey had no power to make the contract. Appellant also contends that the fact that the notes taken in the name of the Valley Bank for the Bank of Smackover were indorsed by the Valley Bank without recourse negatives the alleged contract of guaranty, and that such indorsement cannot be contradicted, and that, if any such contract had been made, it was void under the statute of fraud.

We think the circumstances surrounding the organization and conduct of the affairs of the Bank of Smackover, clearly show the position of the appellant on these questions is not tenable, for, while in theory the two banks were separate and distinct corporations, they were in fact one and the same institution. To escape this conclusion, the appellants urge that the Bank of Smackover was not organized as a branch bank, and any such attempt, either direct or indirect, would be an *ultra vires* act on the part of the Valley Bank, and therefore void because done without authority of the statute,

and also in direct conflict with the express prohibition of § 13 of the State Banking Law passed by the General Assembly at the session of 1923, amending § 677 of Crawford & Moses' Digest. That section, in so far as it is applicable to the appellants' position, is as follows: "If the commissioner is satisfied that the persons named as stockholders have the confidence of the community and are financially able to discharge the obligations resting upon the stockholders under any of the provisions of this act, and that the requisite capital has been in good faith subscribed, * * * then he shall, * * * give to the persons named as stockholders a certificate of incorporation * * * and shall authorize it to proceed with its business; but, with only one office for the transaction thereof in only one town or city as to which the application has been made." The directors of the Valley Bank were advised by the attorneys, that they could not lawfully organize a branch bank at Smackover and, with that advice and the statute above quoted in mind, they sought to do by indirection what was forbidden them to do directly, and by means of this procedure were able to and did secure large increases in the cash deposits carried by it together with all the benefits arising from the deposits nominally made with the Bank of Smackover. The interest it paid on daily balances was in effect paid to itself, and the interest arising from the loans made for the Bank of Smackover was paid to it, and used first in repaying to it the sums advanced to pay for the capital stock of the Bank of Smackover with the understanding that when this debt was discharged all the profits arising from the operations of the Bank of Smackover should become the property of the Valley Bank.

The question is, can the Valley Bank under such circumstances plead and secure protection from liability to the creditors of the Bank of Smackover on the ground that its acts were unlawful? It urges that its *ultra vires*

act was not only the mere excess of corporate authority, but forbidden by the act of the Legislature, *supra,* and therefore was void. This might be true if the Valley Bank itself were seeking some benefit or to enforce some obligation, but not so where it is seeking to escape a liability by reason of its unlawful operations. While, as a general proposition of law, no action can be brought on a contract which is expressly declared void by statute, there are important exceptions to this rule, one of which is that where to hold an *ultra vires* transaction void punishes the very persons whom the Legislature plainly meant to protect, or would be followed by other manifest injustice, no such construction will be allowed. The statute above quoted under which the appellant seeks immunity was manifestly enacted for the protection of those dealing with the bank; its purpose was to protect depositors and other creditors of the institution, and has not expressly made void any act done in contravention to that part of the statute providing for ''only one office for the transaction thereof in only one town or city as to which the application has been made.''

In the case of *Doyle Dry Goods Co.* v. *Doddridge State Bank,* 175 Ark. 153, 298 S. W. 863, a borrower sought to defeat the collection of a loan, because the bank extending the credit did so in violation of the law prohibiting a loan by a bank in excess of thirty per cent. of its capital stock, and the bank by subterfuge so managed the loan as to deceive the Bank Commissioner, and to circumvent the State Banking Law. The borrower insisted that the bank could not recover, because it would be forced to rely on an illegal transaction, and that relief therefore should be denied. The conduct of the bank in making the loan was *ultra vires,* and in violation of the express statutory inhibition, but this court held that, as the provision of the banking law was enacted for the protection of the public in its dealings with banks and as a security for its creditors, the contention of the bor-

rower did not come within the spirit of the law. As it was not the intention of the Legislature to relieve the borrower of liability on account of the violation of the law by the officers of the bank, certainly relief should be denied the bank itself when it seeks to escape a just demand by subterfuge, through which it hopes to evade a statutory inhibition.

Since the Bank of Smackover was organized by a majority of the directors of the Valley Bank and as a feeder for such bank, it must be assumed that they had knowledge, not only of the purpose of its organization, but of the manner in which its affairs were conducted, all of which unquestionably was for the benefit of the parent bank, which benefits were actually received by it. Therefore, although the purpose for which the Bank of Smackover was organized and the manner in which its business was conducted to circumvent the law and the acts of its officers *ultra vires*, the Valley Bank cannot complain nor escape liability for the obligations of the Bank of Smackover. *Wilson* v. *Davis*, 138 Ark. 111, 211 S. W. 152.

In support of the conclusion above reached we quote from the case of *American Southern Trust Co.* v. *McKee*, 173 Ark. 158, 293 S. W. 50, as follows: ''If the American and the St. Louis banks had authorized Walz to take charge of the Bank of Gillette as an instrument through which to carry on their business, or had operated it as a branch bank, or had taken the management and control of the same, their liability would have been the same as if they had done the business in their own name.'' See also *Richardson* v. *National Bank of Mena*, 96 Ark. 594, 132 S. W. 913; *Minneapolis F. & M. Mutual Ins. Co.* v. *Norman*, 74 Ark. 190, 85 S. W. 229, and cases therein cited. Having reached the conclusion that the Valley Bank is responsible for the conduct of the affairs of the Bank of Smackover, the question arises, what is the extent of its liability? The majority of the court are of

the opinion that the liability as fixed by the court below
is correct, and that its decree as to the Bank of Smack-
over should be affirmed.

As to the decision of the chancellor on the question
of interest charges and as to the adjustment and settle-
ment of certain notes by the Bank Commissioner, we are
of the opinion that the finding of the chancellor is cor-
rect, subject only to the proceeds arising from such
interest and compromised settlement to be applied in
the same manner as the other assets of the Smackover
and Valley Banks.

II.  STATE BANK OF LOUANN.

The facts with reference to the dealings of the
Ouachita Valley Bank with the State Bank of Louann
are somewhat different from those with the Bank of
Smackover.  Although in one place in the testimony of
Mr. Ramsey the statement was made that the transactions
of the Ouachita Valley Bank were first had with the
Louann State Bank, and that afterward dealings were
begun between the Smackover Bank and the Valley Bank
on the same basis as that existing between the Valley
Bank and the Louann Bank, he was evidently mistaken
or confused when this statement was made.  The facts
are that the Bank of Louann was organized at some
date which is not disclosed by the record, and that it first
began doing business with the Valley Bank in 1924, at
which time it was a going concern with a capital stock
of $15,000.  As oil had been discovered at Smackover,
so also in the Louann territory, and deposits were being
made in the State Bank of Louann out of all proportion
to its means to safeguard, and handle in the usual way—
that is, the Louann State Bank was unable to loan its
money with proper security, and in amounts sufficient to
carry on the business of the bank, and return a fair in-
terest on the investment, and its vaults were unequal for
the security of its funds.  Its deposits ran well above
$100,000, and frequently to a much larger amount.  At

this time, namely, in 1924, Mr. W. W. Brown, the president of the Ouachita Valley Bank, and Mr. Ramsey, its vice president, acting for themselves, each bought $3,000 worth of the capital stock of the Louann State Bank, and made an arrangement with that bank to transfer its account from the banks with which it was then doing business to the Ouachita Valley Bank, and to do its business exclusively with the Valley Bank, and that all of its deposits, except such as were sufficient to meet the requirements of the law as to cash reserve, should be kept in the Valley Bank for two purposes; one, for the security of those funds, and the other, that the money might be loaned by Brown and Ramsey for the benefit of the Louann State Bank, the Valley Bank paying for the privilege of handling the funds from two to four per cent. on daily balances. Brown and Ramsey agreed to make these loans, and agreed that the Valley Bank would guarantee the payment of all such notes as might be taken for money of the Louann Bank loaned out by them.

In 1927 a representative of the Arkansas State Bank Department, on examining the affairs of the Bank of Louann, found that the local directors at Louann knew nothing about the condition of the bank, and that there was no information or data of record from which its condition might be ascertained. Accordingly, he came to Camden where he conversed with Mr. Ramsey, and found the original notes belonging to the Louann State Bank on deposit with the Valley Bank. Mr. Ramsey stated that the Valley Bank would take care of any losses that the Louann Bank might have on the notes; that it was not a written agreement between the two banks, but was an agreement between Mr. Ramsey and the Louann Bank. A report of this was made to the Bank Commissioner, but there is no showing that such communication was ever made known to the Valley Bank by the Bank Commissioner.

The dealings with regard to lending money and taking notes was practically the same as those had with the Bank of Smackover, some of the notes being made payable to the Valley Bank and indorsed without recourse to the Louann State Bank. Some of these notes, if not all, on becoming due and unpaid, were renewed, payment to be made direct to the Louann State Bank. These notes would be sent to the Louann State Bank for number and entry on its books, and returned to the Valley Bank for safe keeping and collection. Also, when the cash balance of the Louann State Bank would fall below the legal amount, Mr. Ramsey would transfer cash from the Valley Bank sufficient to bring up the cash balance in the Louann Bank to the required amount, and in lieu of such cash advanced would take a part of the notes of the Louann Bank, and transfer them on its books to the account of the Valley Bank. There were two notes, aggregating the sum of $1,000, of the Page Oil Corporation taken by the Valley Bank, or Ramsey for the Bank of Louann, but these were objectionable to the Bank Commissioner, of which fact Ramsey was informed, and the notes were taken back and the Louann Bank given credit for them on its account with the Valley Bank.

Mr. S. M. Harris, cashier of the Louann State Bank, after reciting the agreement between Brown and Ramsey on the one part and the Louann State Bank on the other, and that the notes taken for the loan of its money should be guaranteed, stated: "It was a great convenience to the Louann Bank to have the Valley Bank make the loans for it. We had a superfluity of depositors and a dearth of borrowers. I would not have accepted the notes if it had not been for the agreement with the Valley Bank."

Mr. Ramsey was asked the following question: "But it was your understanding that the Ouachita Valley Bank dealt with the State Bank of Louann and the Bank

of Smackover, so far as these notes were concerned, on exactly the same basis—that is, it was guaranteed to the State Bank of Louann and also to the Bank of Smackover the payment of every one of these notes sent from the Ouachita Valley Bank to either of these banks, and you so testified in your original testimony?'' Ramsey answered, ''Yes, sir, that is my recollection.'' Mr. Brown testified, and also Mr. Ramsey, that there were never any objections made to the actions of either of them as to what they had done or the action they had taken as to the Bank of Smackover or the Louann State Bank. However, nowhere in the testimony is there any evidence that any member of the board of directors of the Ouachita Valley Bank, except Mr. Brown, knew that Ramsey had guaranteed to the Louann State Bank the collection of the notes, and there is nothing in the testimony from which such an inference could be drawn. There was no action taken in the matter or any authority shown to have been given by the board of directors of the Valley Bank to Ramsey to make the guarantee for such bank.

From the above statement it is apparent that the liability of the Valley Bank to the Louann Bank must be measured by different rule from that applied to the Bank of Smackover. In the first place, it may be said that Mr. Brown, the president of the Valley Bank, by virtue of his office, had no inherent power to bind his principal by any contract that he might make. His powers as such were very small, and his control over the affairs of the Bank of the slightest, except as to the exercise of powers delegated by the governing body (board of directors), or of which they had knowledge, or which he had openly exercised for so long a time as would impute such knowledge. In his transactions with the Louann Bank, except the negotiating of loans, the borrowing of money and the handling of commercial paper, he had no power either expressly granted or which

he was ever shown to have exercised. Indeed, it may be said that he did not himself deal with the Bank of Louann, but all of such dealings were made by Mr. Ramsey. Mr. Brown stated that the negotiations were had by Ramsey, and reported to him (Brown), and that he sent none of the notes to the Louann Bank and did not know how they were indorsed until long afterward; that he did not send the notes and did not know when they were sent back. In their dealings with the Louann Bank, Ramsey and Brown insist that they were not the agents of the Louann Bank, but of the Valley Bank, but it is not from their statements that their relationship with the Louann Bank and their authority to deal therewith so as to bind the Valley Bank can be tested.

As is said in 1 Mechem on Agency, § 285: "The authority of an agent, and its nature and extent, where these questions are directly involved, can only be established by tracing it to its source in some word or act of the principal. The agent certainly cannot confer authority upon himself or make himself agent merely by saying that he is one." This rule was recognized by this court in *American Southern Trust Co.* v. *McKee,* 173 Ark. 147, 293 S. W. 50. Both Brown and Ramsey had absolute authority in dealing with all matters relative to the lending and collection of money; they had charge of the loan and discount department of the Valley Bank, made and collected loans, handled the borrowing of money and the extension of notes, and for all of these purposes "ran the bank." Of course, they could, and did, bind their principal in doing anything within the apparent scope of their authority as to such matters, but there was and could have been no implied authority to bind the principal in any transaction not included in, or necessarily implied from, their dealings relative to the business intrusted to their management. The circumstances show that the interest of Ramsey and Brown, in so far as their relations with the Louann Bank were

concerned, was in conflict with the duties they owed the Valley Bank. The deposits of the Louann Bank were out of all proportion to the amount of its capital stock, and the handling of these deposits promised large returns; Brown and Ramsey were owners of two-fifths of the entire capital stock of the Louann Bank; Ramsey was paid a salary by that bank; the revenue which would be derived from the loans made would belong to the bank, and, as stockholders, they would share largely in it. It was greatly to their interest to see that the loans made of the funds of the Louann Bank be secured in every possible way, while the Valley Bank had no direct interest in these matters, and it would not be to its interest, but very much against it, to pledge its faith and credit to the guarantee of loans of the Louann Bank made by its own directors and paid employees. Ramsey states most positively that in these transactions he was acting as the agent of the Valley Bank, but the facts themselves contradict him. As we have seen, he was interested in the Louann Bank, and that interest conflicted with the interest of his principal. "An agent cannot prostitute the name of his principal to the service of his own personal notes, and this rule applies with full force to the officials of a corporation in making use of a corporate name." *City Electric Street Ry. Co.* v. *First Natl. Bank,* 65 Ark. 543, 47 S. W. 855.

In *Greer* v. *Levee Dist. No. 3,* 140 Ark. 60, 215 S. W. 171, Mr. Justice Wood, speaking for the court, said: "The knowledge of J. J. Scroggins, president of the bank, and his testimony as to the purpose of himself and co-makers in borrowing the money from the bank, is not chargeable to the bank, for in that transaction, where his interests conflicted with that of the bank, it must be held that he was not acting for or representing the bank, and his conduct could create no estoppel against the bank to enforce the payment of the notes."

It is argued that the bank knew of the guaranty made by Ramsey, and acquiesced in by Brown, because

they contend that the knowledge of Brown, the president, and of Ramsey, the vice president, was that of the bank itself. This contention is answered in *Greer* v. *Levee Dist., supra,* and in the case of *First Natl. Bank* v. *First Natl. Bank,* 159 Ark. 517, 252 S. W. 594, where it is said: "The testimony developed the fact that the cashier of each of these banks was lending money to the other, and in about equal amounts, but they both testified that they had authority from their respective boards to do so. It is the theory of the defendant that the cashier of the plaintiff bank knew Harkins was acting for himself and not for the defendant bank in this transaction, and an attempt was made, on his cross-examination, to develop the fact that the note was not sent to the defendant bank, but was sent to Harkins individually. An objection was made to this testimony, but we think it was proper. If there was, in fact, a collusive agreement between these cashiers to lend each other money, and the cashier of the plaintiff bank sent the note to Harkins knowing that in what Harkins did he would be acting for himself individually, and not for the bank, the defendant bank would not be liable for the conversion of the note by Harkins, even though he should admit its conversion, because, in a transaction of that kind he would not be the bank's agent."

As a matter of fact, the alleged guaranty made by Ramsey to the Louann Bank was unknown to any of the directors of the Valley Bank except Brown. Neither Brown nor Ramsey testified that any responsible member of the Valley Bank was ever advised of this transaction. They say they made no attempt to conceal what they did from the board of directors of the Valley Bank, but the fact remains that only those two and the cashier of the Louann Bank knew anything about the guaranty, and they did not disclose the same to the directors of the Valley Bank. Each member of the board of directors of the Valley Bank testified in this case, and they all

stated that they did not know, and had never been informed, of any such contract, and that they only knew that the Louann Bank was carrying its deposits with the Valley Bank as any other bank would do; that this was not unusual in banking affairs, and none of the dealings with the Louann Bank was of such nature. Ramsey testified there was nothing out of the ordinary rules of banking in sending the notes to the Valley Bank for collection—it had much safer vaults than the Louann Bank, and was a much safer place to keep money. Had the directors of the Valley Bank made an inspection of the books of the Valley Bank with a view of ascertaining the mode of its business with the Louann Bank, nothing out of the ordinary would have been disclosed. None of the notes were carried on the books of the Valley Bank in its bills receivable account, but all were kept in a file as the property of the Louann Bank. Mr. Ramsey stated that he was ready at any time to take up any bad note of the Louann Bank, and pay the cash of the Valley Bank therefor, but this intention was not known to the board of directors of the Valley Bank, and there was no custom of that kind in which the directors could have acquiesced or about which they could have known. There was only one bad note shown to have been handled in this way during the four or four and a half years which elapsed from the beginning of the business with the Louann Bank until the close of the Valley Bank's doors in 1928. This could not show a course of dealing, the knowledge of which would be imputed to the bank.

Inasmuch as Brown and Ramsey, in making the alleged guaranty, were acting in their own interest, and adverse to the interest of the Valley Bank in this transaction, as they were acting beyond the scope of their authority without the express or implied authority to do so, as this conduct on their part was unknown to the board of directors, and there were no circumstances

shown from which such knowledge might be imputed to them, it is our opinion that such guaranty was not binding on the Valley Bank, and the chancellor erred in so holding. This cause must, therefore, be reversed and remanded with directions to enter a decree in conformity with the principles of equity, and not in conflict with the views herein expressed.