## TISA et al. v. POTOFSKY et al.

United States District Court
S. D. New York.
April 14, 1950.

Witt & Cammer, New York City, for plaintiffs.

Arthur J. Goldberg, Washington, D. C., Herman E. Cooper, and William Isaacson, New York City, for defendants.

RIFKIND, District Judge.

Plaintiffs have moved for a temporary injunction and defendants have cross-moved for an order dismissing the action on a variety of grounds, including want of jurisdiction. Alternatively, the defendants have made a motion to transfer the case to the U. S. District Court for the District of Columbia, 28 U.S.C.A. § 1404(a). For obvious reasons, I shall first address myself to the cross-motion. The action, which is for a permanent injunction and for a declaratory judgment, is brought by John Tisa, Armando Valdes, and Donald Henderson, three members of the Food, Tobacco, Agricultural and Allied Workers Union of America, hereinafter referred to as FTA, who are also, respectively, President, General Secretary-Treasurer, and National Administrative Director of the FTA. Plaintiffs sue individually and as representatives of the members of FTA. The action is brought against Jacob Potofsky, Joseph Curran and Emil Mazey, individually, as members and representatives of the members of the Executive Board of the Congress of Industrial Organizations, hereinafter called CIO, and as the Trial Committee of the Executive Board of the CIO; and against Michael J. Quill, individually and as a representative of the members of said Executive Board.

Federal jurisdiction is alleged to be founded upon diversity in the citizenship

of the parties, and the amount involved is said to satisfy the statutory requirement.

Certain background allegations with respect to which there is no substantial dispute can be stated. The FTA is a national labor organization composed of many local labor unions. It is one of the national labor organizations which, in 1938, participated in the founding of the CIO. The certificate of affiliation, granted in 1938 by the CIO to the FTA (then known as the United Cannery, Agricultural, Packing and Allied Workers of America) contained the following clause:

"This certificate with all of the rights and privileges appurtenant thereto is granted upon the condition that the said Union shall at all times comply with the Constitution of the Congress of Industrial Organizations: and in the event of violation thereof this Certificate may, pursuant to said Constitution, be revoked, whereupon all rights and privileges appurtenant thereto shall be annulled."

The following clauses in the 1938 constitution of the CIO are pertinent to this decision:

Article III, Section 6: "No affiliate shall be suspended or expelled, except upon a two-third vote at the convention. This provision may not be amended except by a two-third vote at the convention."

Article IX: "This constitution, except as otherwise provided, may be amended by a majority vote at the convention."

At the November 1949 convention, the following amendment to the CIO constitution was adopted:

Article VI, Section 10: "The Executive Board shall have the further power, upon a two-thirds vote, to revoke the Certificate of Affiliation of or to expel or to take any other appropriate action against any national or international union or organizing committee the policies and activities of which are consistently directed toward the achievement of the program or the purposes of the Communist Party, any fascist organization, or other totalitarian movement, rather than the objectives and policies set forth in the constitution of the CIO. Any action of the Executive Board

under this section may be appealed to the Convention, provided, however, that such action shall be effective when taken and shall remain in full force and effect pending the appeal."

Shortly after the close of the convention at which this amendment was adopted, William Steinberg, a member of the CIO Executive Board, filed charges that certain unions, including the FTA, were pursuing policies and activities "consistently directed toward the achievement of the program or the purposes of the Communist Party rather than the objectives and policies set forth in the Constitution of the CIO," and requested that the Executive Board take appropriate action to expel the named organizations from the CIO. Thereupon, the Executive Board authorized Philip Murray, the president of the CIO, to appoint a Trial Committee to hear the charges against the FTA and to make a report to the Executive Board recommending appropriate action. The committee was appointed and the Executive Board passed a resolution approving the president's action. On November 7, 1949, Murray, as president of the CIO, notified the FTA of the charge against it and of the appointment of the Trial Committee, consisting of defendants Potofsky, Mazey and Curran. On December 15, 1949, Potofsky, as chairman of the Trial Committee, wrote to the FTA, notifying it that a hearing on Steinberg's charge would be held January 6, 1950, and outlining the rules of procedure to govern the hearing.

Papers submitted after the filing of the complaint reveal the following additional facts. Hearings were held pursuant to the above notice on January 6 and 7, 1950. Witnesses for both sides were heard. The Trial Committee also met on January 19, 1950 and February 6, 1950. In its report to the Executive Board, the Committee unanimously concluded that the "policies and activities of the FTA are consistently directed toward the achievement of the program and the purposes of the Communist Party rather than the objectives and policies set forth in the CIO Constitution." The Committee recommended that the Executive Board exercise its powers under

Article VI, Section 10 and "revoke the Certificate of Affiliation heretofore granted to the FTA and expell it from the CIO."

The Committee report was received by the Executive Board at a meeting of the Board on February 14, 1950. On February 15, 1950 the Executive Board passed a resolution adopting the Committee report and revoking the FTA's certificate of affiliation and expelling the union, effective March 1, 1950.

The complaint alleges that the individual defendants had entered into a conspiracy among themselves, and with other members of the Executive Board of the CIO and other persons, to seize control of the policies of the FTA, to destroy the autonomy of the FTA, to weaken FTA's general condition by raiding and maligning it, and ultimately to expel it if it resisted and survived such attacks.

It is further therein alleged that, in pursuance of this conspiracy, the defendants proposed and secured the passage of amendments to the CIO constitution at the November 1949 convention contrary to the principles underlying the original formation of the CIO and in violation of the contractual relations between the FTA and the CIO. The plaintiffs claim that the charges filed against FTA are void, the hearings illegal, and the Trial Committee incompetent for a variety of reasons, which will be considered below in some detail. They allege they will be irreparably injured unless a temporary injunction be granted by which defendants are restrained from continuing their conspiracy to violate the contract of affiliation between FTA and CIO, to expel the FTA from the CIO, and to injure the FTA and its members in divers other ways. The complaint also seeks a permanent injunction to the same effect, and a declaratory judgment that the constitutional amendments are void and the attempt to expel the FTA illegal.

Defendants assert that the court is without jurisdiction over the subject matter because of the prohibition of the Norris-LaGuardia Act, 29 U.S.C.A. § 101. They further claim that the suit is not maintainable as a class action because class actions in the federal courts by or against labor unions were abolished by section 301 of the Labor-Management Relations Act, 29 U.S.C.A. § 185(b). The class suit device is also objected to on the grounds that, as to the class represented by plaintiffs, the requirements of Rule 23 of the Federal Rules of Civil Procedure, 28 U.S. C.A., have not been met, and that, as to the defendants, the members of the CIO Executive Board do not constitute a class. The absence of indispensable parties defendant is presented as another ground for dismissing the complaint. Finally, defendants contend the complaint fails to state a claim upon which relief may be granted, because (1) the plaintiffs have lost their good standing within the CIO and have forfeited the rights upon which they declare; (2) the complaint reveals on its face that the plaintiffs have not exhausted their internal remedies within the CIO; and (3) the proceedings taken by the CIO against the FTA are in all respects lawful and proper. The several defenses and objections will be considered in the order stated.

■ The Norris-LaGuardia Act restricts the issuance of injunctions in cases "involving or growing out of a labor dispute." 29 U.S.C.A. § 101. I do not agree with the defendants' contention that the present case is clearly within the prohibition of the act. Basically, this is a suit to prevent the directors of a labor organization from taking certain action against a member organization. It is not a "labor dispute" which is defined as a "controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment * * *." 29 U.S.C.A. § 113. Only indirectly and speculatively, if at all, can a jurisdictional dispute concerning union representation be seen to reside in the facts alleged in the complaint. In cases cited by the defendants, where the prohibition of the Norris-LaGuardia Act has been applied, representation was at the nub of the dispute. See, e. g., Green v. Obergfell, 1941, 73 App.D.C. 298, 121 F.2d 46, 52, 138 A.L.R. 258, certiorari denied 314

U.S. 637, 62 S.Ct. 72, 86 L.Ed. 511; International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers v. International Union of United Brewery Workers, 9 Cir., 1939, 106 F.2d 871, 876.

The contention that the Labor-Management Relations Act abolishes class actions in the federal courts by or against labor unions is based upon section 301(b) of that act, 29 U.S.C.A. § 185(b), which reads, in part: "Any such labor organization may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States. Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets."

There is some question as to whether this section is applicable generally, or only to suits for violation of a collective bargaining contract. I need not meet that problem, however, for even if I assume that the section has general applicability, I do not think it has the effect defendants ascribe to it. There is no inconsistency in permitting unions to sue and be sued in their common names and at the same time allowing them to sue and be sued by the device of the class action. Cf. Tunstall v. Brotherhood of Locomotive Fireman and Enginemen, 4 Cir., 1945, 148 F.2d 403.

As this case indicates, the class suit continues to serve a useful function. If the class suit is to be considered abolished in this field, it can be only because of the clearly expressed mandate of Congress. I do not find such an intention in the language of 29 U.S.C.A. § 185(b). In fact, the language used is expressly permissive: "*may* sue or be sued as an entity * * *." To support their interpretation, defendants must rely primarily on the provision requiring that judgments be enforceable only against the assets of the entity and not of the individual members. But a limitation on the enforcement of judgments against unions does not support the conclusion that Congress intended to abolish the class action by and against unions.

I reject defendants' interpretation of the Labor-Management Relations Act, and regard the class action as still available. The decision in Schatte v. International Alliance, D.C.S.D.Cal.1949, 84 F.Supp. 669, 673, cited by the defendants, does not conflict with this conclusion. To the extent that its dicta are inconsistent with the views here expressed, I find myself unable to follow it.

The defendants next contend that even if the class suit device is permissible, it was not properly utilized, both as to the class represented by plaintiffs and the class represented by defendants. First, the defendants say, the right sued upon is a derivative right and it does not appear that the primary holders of the right have refused to enforce it; secondly, they argue, the Executive Board of the CIO does not constitute a class.

Rule 23(b) of the Federal Rules of Civil Procedure is not applicable to the plaintiffs because they are not shareholders. Rule 23(a), however, is relevant. It permits a class action when the character of the right to be enforced is "joint, or common, or secondary in the sense that the owner of a primary right refuses to enforce that right and a member of the class thereby becomes entitled to enforce it." Defendants' contention is that only the union as an entity owns the rights here sued upon, since only the union, not the members thereof, is a member of the CIO. From this they would deduce that any rights the members of FTA have are secondary, and that the class action is fatally defective in that it does not appear that the owner of the primary right has refused to enforce it.

It is true that there is a growing tendency to regard labor unions, procedurally, as legal entities. See, e. g., Rule 17(b), Federal Rules of Civil Procedure; 29 U.S.C.A. § 185(b). But these are deviations from tradition. On the whole, the metaphysics of the common law still permeates the judicial view, and the unincorporated association is conceived of as an aggregate of individuals, all of whom have to be joined in order to obtain relief for or against the association. This underlying

concept is reflected even in some statutes which authorize suits by or against unincorporated associations by naming the president or treasurer. E. g., N.Y. General Associations Law, McKenney Consol.Laws, c. 29, §§ 12, 13. I conclude that, for purposes of testing the propriety of a class action, the rights acquired by the FTA under its contract with the CIO, were rights acquired by the aggregate of individuals composing the union, and this aggregate properly sues, through its representatives, for the enforcement of their joint or common rights. Although no cases have been called to my attention in which the issue is squarely raised, it would appear that the construction here advocated has been generally applied. Professor Moore points out that the suit by representatives of an unincorporated association is a good illustration of the use of the class suit. 3 Moore's Federal Practice 3435 (2d Ed.). Such a practice could not have prevailed were the requirement enforced that it must appear that the union as an entity refused to assert the rights.

█ █ The second alleged defect in the use of the class suit here affects the capacity of parties on the defendants' side. It is asserted that the members of the CIO Executive Board do not constitute a class. A common test for availability of the class device is that the action should be "one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court." 3 Moore's Federal Practice 3404 (2d Ed.). Since the Executive Board consists of more than 50 members, I think it is sufficiently numerous to render it impracticable to bring all before the court. The defendants, however, assert that the members of the Executive Board do not have a common interest since several of the members, representing the accused unions, undoubtedly oppose expulsion. But the action which the plaintiffs seek to enjoin is not the action of individual members of the Board, but of the Board itself. The disputed amendment to the CIO constitution reads, in part: "The *Executive Board* shall have the * * * power, upon a two-thirds vote, to * * *

expel * * *." Once the vote is taken and the necessary approval acquired, then the action sought to be prohibited becomes the action of the Executive Board as a whole, regardless of how each member voted. Consequently there is a "common or general" interest in the question at hand on the part of the members of the Executive Board, and the class suit is properly used.

The objection to the absence of indispensable parties defendant is made only on the assumption that a class suit against the Executive Board is improper. Hence this objection falls with the premise.

█ Though the complaint does not disclose it, defendants aver by affidavit that the FTA is in default in its obligations to the CIO and, therefore, has forfeited the rights and privileges accorded the union by the certificate of affiliation, which were granted on condition that the union at all times comply with the CIO constitution. The defendants present affidavits attesting to the failure of the FTA to pay its per capita tax for more than a two month period, and its consequent loss of "good standing" pursuant to Article VIII, Section 3 of the 1949 CIO constitution. That article reads: "Any affiliate which is in arrears to the Organization for per capita tax for two months or more shall not, unless exonerated in accordance with the provisions of this Constitution, be in good standing, and shall not be entitled to representation on the Executive Board until restored to good standing by the payment of all per capita tax due under the provisions of this Article."

The plaintiffs do not traverse the allegation that the FTA is in arrears. But the defendants attribute to that fact greater significance than either the certificate of affiliation or the CIO constitution permits. The certificate of affiliation provides, "* * * and in event of violation thereof [the Constitution] this Certificate may, pursuant to said Constitution, be revoked, whereupon all rights and privileges appurtenant thereto shall be annulled." The rights are lost, not on non-compliance, but on revocation of the certificate for

non-compliance. The Constitution, Article VIII, Section 3, provides the only consequence immediately flowing from non-payment of the per capita tax: loss of "good standing" with a consequent loss of representation on the Executive Board.

The defendants seek dismissal of the action on the ground that it appears on the face of the complaint that plaintiffs have not exhausted all internal remedies available to them. The complaint, however, alleges that plaintiffs have no remedy in the Executive Board because the individual defendants in this action control the Board and are determined to expel the FTA. The complaint further asserts that there is no other tribunal within the CIO to which plaintiffs can go for protection of their rights. This last assertion is not contradicted by the inclusion, as an exhibit attached to the complaint, of Article VI, Section 10 of the 1949 CIO constitution, which provides for an appeal from the Executive Board to the CIO convention. Under Article VI, Section 10 the expulsion remains effective pending the appeal to the convention, which, under Article VII, Section 2, will not be held until October or November of this year. The alleged irreparable violation of FTA's rights, however, occurs immediately upon expulsion. Consequently, as a practical matter, there is no tribunal available within the CIO to which appeal can be made to prevent these wrongs. Hence I conclude that the complaint is not premature.

Defendants finally argue that the complaint should be dismissed because of failure to state a claim upon which relief can be granted, in that it appears from the complaint that the proceedings against the FTA are in all respects lawful and proper. However, it seems to me that a complaint alleging that vague charges were filed against the union, that a hearing on the charges was held by a biased committee, that the ultimate decision of the Executive Board was predetermined, and that the amendment on which the charges were based was in reality being applied retroactively, states a claim on which relief may be granted.

I turn now to plaintiffs' application for a temporary injunction. In detail, the plaintiffs allege that the charges filed against them are void because (1) they are based on an amendment to the constitution of the CIO which is invalid because contrary to public policy; (2) they are based on an amendment to the constitution which is invalid because it alters the basic compact among the affiliated organizations of the CIO, and is beyond the power of the CIO to enact; (3) they apply the amendment retroactively and *ex post facto* to punish FTA for actions, beliefs, and policies which were, when taken, held and pursued, valid and proper; (4) they are too vague, indefinite, and uncertain to afford a proper or adequate opportunity to defend against them.

The plaintiffs further contend that the rules governing the hearings before the Trial Committee denied them due process. Lastly, the plaintiffs allege that the hearing was a mere facade to conceal a decision which had been predetermined, and that the members of the committee were biased. These contentions will be treated in order.

The contravention of public policy is said to reside in the fact that the amendment compels a choice between membership in the CIO and forfeiture of basic constitutional rights, such as freedom of speech and political activity. Reliance is placed on cases like Otto v. Journeymen Tailors' Protective & Benevolent Union, 1888, 75 Cal. 308, 17 P. 217, 7 Am.St.Rep. 156; Ray v. Brotherhood of Railroad Trainmen, 1935, 182 Wash. 39, 44 P.2d 787; Spayd v. Ringing Rock Lodge, 1921, 270 Pa. 67, 113 A. 70, 14 A.L.R. 1443; Matter of Gallaher v. American Legion, 1934, 154 Misc. 281, 277 N.Y.S. 81, affirmed 242 App. Div. 604, 271 N.Y.S. 1012.

The principles recognized in these cases need not be challenged. Their applicability to the pending issues, however, is very easily subject to challenge. Whereas restriction on membership in a labor union might be a matter of the greatest moment to an individual, affecting his ability to secure employment, his right to enjoy statutory privileges, his opportunity to profit

from special health programs, etc., such disadvantages do not necessarily follow upon the exclusion of a national labor organization from an association of national labor organizations. Hence, if it be granted that a labor union may not determine the manner in which a member will exercise his franchise as a citizen, it does not follow that a confederation of associations may not specify the objectives and purposes animating their common activity and expel from membership such associations as, in the judgment of the confederation, are moved by purposes hostile to those of the confederation.

Indeed, it seems to me that such is the essence of the voluntary association. I see no infraction of public policy on the part of an association of unions dedicated, for example, to the spread of craft unionism in excluding or expelling a union devoted to the growth of industrial unionism. That the purposes and objectives of the CIO are in part political, entails the consequence that the exclusion or expulsion may be of groups dedicated to a political philosophy at odds with that of the CIO. It appears from the statement of purpose in the 1938 constitution that the CIO had, from the very beginning, certain political and economic objectives. For example, one of its aims read as follows: "(4) To secure legislation safeguarding the economic security and social welfare of the workers of America, to protect and extend our democratic institutions and civil rights and liberties, and thus to perpetuate the cherished traditions of our democracy."

If the FTA should now become a dissenter from the political and economic objectives of the CIO, it can not be heard to complain should the CIO now attempt to expel it, so long as the expulsion is undertaken under a fair and valid procedure. And this, although it is perfectly true that the FTA, on expulsion, will lose property rights, and that in a sense, these rights are forfeited for the freedom to follow its own economic and political ideas.

The public policy argument failing, plaintiffs lean on the asserted violation of the underlying compact of the affiliates composing the CIO. The plaintiffs' theory is that autonomy of the affiliates was a principle basic to the organization of the CIO, and that the 1949 amendment violated that principle and was, therefore, invalid. Whatever a trial may reveal, it is unsafe to rely on the affidavits to resolve such an issue. The 1938 constitution stated the objects of the CIO. Certificates of affiliation were granted upon condition that the affiliate comply with the constitution of the CIO. How basic to the structure of the CIO was the principle of autonomy and how that principle integrated with the constitutional objects of the CIO, can best be determined by trial.

I do not read Article VI, Section 10 as necessarily inconsistent with the 1938 objects of CIO. Rather, the new section may be read as amounting in substance to a declaration, or a finding of fact, by the convention that the program and purposes of the Communist Party, Fascist organizations, and totalitarian movements are inconsistent with the objectives and policies of the CIO as "set forth in the Constitution of the CIO." Surely plaintiffs have not established by affidavit that such a finding of fact is so irrational as to be rejected by the court regardless of the action of the duly constituted convention. And surely it cannot be successfully argued that the broad power of amendment which the contract between the parties established, was too narrow to encompass an amendment which delegated to the Executive Board a reviewable power to expel in a small class of cases carved out of the whole group of cases where expulsion presumably was permissible to the convention.

Plaintiffs do not assert that the 1949 amendments were adopted by methods which were not procedurally correct. The 1938 constitutional provision for expulsion of an affiliate from the CIO could by its own terms be amended only by a two-thirds vote. The 1949 convention adopted the new amendments by a two-thirds vote.

It is said that the amendment is applied to FTA retroactively. If so, perhaps FTA's rights are being unlawfully invaded.

Polin v. Kaplan, 1931, 257 N. Y. 277, 282, 177 N.E. 833. But it is not

wholly clear from the evidence before me that the amendment is in fact being improperly applied. It is by no means improbable that the amendment does not create a new cause for expulsion but merely changes the procedure for effecting expulsion for a cause previously warranting that extreme step. This construction would flow from reading the constitution and certificate of affiliation to justify expulsion for policies pursued by an affiliate which thwart or tend to obstruct the objectives of the confederation. Whether this reading is the proper one need not and should not be determined on affidavits. Such instruments as union constitutions should be read in their living context. It is sufficient, for the purpose of considering an interlocutory application, where the petitioner has the burden of showing a clear right to the injunctive relief demanded, to conclude that the constitution may be read so as to reveal no infringement of the plaintiffs' rights.

 The objections to the unfairness of the proceedings, the vagueness of the charges, and the bias of the judges can well be considered together. It is useful, at the outset, to state clearly that not all the niceties of due process which have by one court or another been engrafted onto our criminal proceedings have necessarily become part of the regulations which must govern intra-associational proceedings. That the hearings, according to the notice of the trial committee, were to be informal and closed and that counsel were to be excluded, do not necessarily condemn the proceedings as unfair. The restriction of FTA's witnesses to those invited by the trial committee, has been abandoned by defendants in open court.

The plaintiffs challenge the adequacy of the amendment and the charges based thereon, to give the FTA sufficient notice of the issues it must meet. Here, too, a heavy reliance on the analogies of the criminal practice is misplaced. The question is not one of formality but of fact. Did FTA have adequate information of the character of the accusation which it was to meet? That is a factual issue not to be summarily resolved. And the same is manifestly true of the allegations that the trial committee is disqualified for bias.

A copy alleged to constitute a transcript of the hearing held by the trial committee and which occurred after the oral argument in this case has been submitted to me. I have not read it since it has not been analyzed or adverted to by counsel in any substantial sense.

I conclude that the petitioners have not established a clear right to the injunctive relief demanded, see, Chase v. Rieve, D.C., 90 F.Supp. 184, and the motion for a temporary injunction must therefore be denied. For reasons already indicated, the defendants" cross-motion to dismiss the complaint is also denied.

The defendants have shown me no substantial reason for transfer of the case to the United States District Court for the District of Columbia under 28 U.S.C.A. § 1404, and that cross-motion too is denied.