KETCHER et al. v. SHEET METAL
WORKERS' INTERNATIONAL
ASS'N et al.
Civ. A. No. 2596.

United States District Court
E. D. Arkansas, W. D.
Oct. 14, 1953.

Mehaffy, Smith & Williams, Little Rock, Ark., for plaintiffs.

Martin, Dodds & Kidd, Little Rock, Ark., Mulholland, Robie & Hickey, Toledo, Ohio, Rector, Cockrill, Limerick & Laser, Little Rock, Ark., for defendants.

LEMLEY, Chief Judge.

This cause is before the Court upon the motions of the respective defendants to dismiss the plaintiffs' second amended and substituted complaint [1] upon juris-

1. When the original complaint was filed, the defendants filed motions to dismiss it, which motions were briefed. Preliminary study on our part convinced us of the desirability of having the complaint amended, at least in certain respects, and we gave the plaintiffs leave to amend. Thereafter, the plaintiffs filed an amended and substituted complaint, and the defendants formally renewed their mo-

dictional grounds and for failure to state a claim upon which relief can be granted, which motions have been submitted upon written briefs.

This is an action brought by the plaintiffs, individual citizens of Arkansas and an Arkansas corporation, which are engaged in the business of sheet metal contracting, against the Sheet Metal Workers' International Association, an unincorporated international labor union; Local Union 249, which is an unincorporated local union and an affiliate of the International Union; E. P. Eilmes, a citizen of Washington who is alleged to be a representative of the International Union; Blaw-Knox Company, a Delaware corporation which is the prime contractor for the United States Government in the construction of the Pine Bluff Arsenal in Jefferson County, Arkansas; and King McCreery, an individual citizen of Pennsylvania who is engaged in the performance of a sub-contract with Blaw-Knox at the Pine Bluff Arsenal. The amount in controversy exceeds the jurisdictional amount of $3,-000. The purpose of the action is to recover damages from the two labor unions for an alleged breach of a collective bargaining agreement, dated March 1, 1952, between the Union Employers Section, Sheet Metal Contractors Association of Arkansas, Inc., of which Association the plaintiffs are alleged to have been members, on the one hand, and the Local Union, on the other hand. Plaintiffs likewise seek to hold Blaw-Knox, King McCreery, E. P. Eilmes and the membership of the International Union [2] liable in tort for an alleged conspiracy to bring about the breach of the aforementioned agreement, and for having in fact caused said alleged breach. Jurisdiction of this Court over the contract claim is predicated upon Section 301(a) of the Taft-Hartley Act, 29 U.S.C.A. § 185(a), and jurisdiction over the tort claim is based upon diversity of citizenship, 28 U.S.C.A. § 1332. To establish jurisdiction over the members of the International Union with respect to the latter claim the plaintiffs rely upon the class suit device permitted by Rule 23(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.; it is alleged in this connection that the members of the International Union constitute a class so numerous as to make it impracticable to bring them all before the Court, that the right sought to be enforced against the class is joint and common, and that the defendant, Eilmes, a citizen of Washington, is an adequate representative of the class. No tort relief is sought against the Local Union as an entity.

The second amended and substituted complaint, hereafter simply called the "complaint", consists of a number of introductory paragraphs followed by two separate counts, the first of which sets out the contract claim, and the second of which sets out the tort claim. A copy of the collective bargaining agreement was attached to the original complaint as an exhibit and has been referred to in the complaint now before us.

In the introductory paragraphs of the complaint, the status, residences and businesses of the parties are set forth in considerable detail. In this connection it is alleged that the International Union is an unincorporated international labor or-

---

tions; additional briefs were filed, and the motions were set down for oral argument. When the case was called up for argument, we asked certain questions addressed to counsel on both sides, and as a result of the answers elicited to these questions and of a considerable colloquy which took place between Court and counsel, the plaintiffs were given leave to file a second amended and substituted complaint, with the understanding that the motions of the defendants would be considered as renewed and di-

rected at the second amended and substituted complaint without the necessity of their taking any formal action. After the filing of the second amended and substituted complaint new briefs were submitted by both sides.

2. The tort claim against the members of the International Union is alternatively pleaded; that is to say, the plaintiffs seek no recovery against said members in tort if they can recover against the Union on the contract claim.

ganization having its home office in Washington, D. C.; that the said International Union represents journeymen and apprentice sheet metal workers; that the Local Union is a subordinate of the International Union, and that, with certain minor exceptions, members of the International Union employed in Arkansas are also members of the Local Union. It is further alleged that the plaintiffs are "employers", and that the International Union and the Local Union "is (sic) a labor organization (or organizations) representing the employees in an industry affecting interstate commerce".

In Count One of the complaint, it is alleged that the Sheet Metal Contractors Association of Arkansas, Inc. is an Arkansas corporation, organized on a nonprofit basis for the purpose, among others, of promoting harmonious labor relations in the sheet metal industry in Arkansas; that the membership of the Association is composed of sheet metal contractors, including the plaintiffs, who employ union labor, and, likewise, of those who do not; and that it has been the practice for sheet metal contractors in Arkansas to bargain as a group through designated representatives, rather than as individuals, and that since the organization of the contractors' association that organization has been the bargaining representative and agent of the sheet metal contractors employing union labor. It is further alleged that on the employers' side collective bargaining negotiations have been carried on by a committee composed of members of the Union Employers Section of the Association, appointed by the president thereof.

Plaintiffs next allege in Count One that in executing the collective bargaining agreement here in suit the Union Employers Section was acting as the representative and agent of all members of the Section, including the plaintiffs, and that the representative of the International Union who participated in the negotiations was acting for both the local and the international union. Plaintiffs further allege that after the negotiation and execution of the contract all of the plaintiffs and both of the unions operated under it and observed its terms and conditions until March 2, 1953, when it was breached by the unions. With respect to the alleged breach the plaintiffs aver that on March 2, 1953, the unions caused their members who were in the employ of the plaintiffs to fail to report for work, and, further, that the unions failed to supply laborers to the plaintiffs after the said date and caused the businesses and certain jobs of the plaintiffs to be picketed. Each plaintiff claims substantial damages in excess of $3,000.

Under the terms of the contract the Local Union was recognized as the exclusive bargaining agent for all journeymen and apprentice sheet metal workers of "the Employer", which was the term applied to the Union Employers Section, Sheet Metal Contractors Association of Arkansas, Inc.; the contract further provided that the union should furnish "at the request of the Employer, duly qualified journeymen sheet metal workers and registered apprentices in sufficient numbers as may be necessary to properly execute work contracted for by the Employer in the manner and under the conditions specified in this Agreement". The contract was to become effective March 1, 1952, and was to remain in force and effect until March 1, 1953, and was to remain further in effect "from year to year thereafter, unless written notice of change is given not less than ninety (90) days prior to the expiration date and until conference relating to such requested change has been terminated by the execution of a new agreement or otherwise. * * *" There was a specific provision to the effect that if any provision contained therein should be contrary to any valid state or federal law, such provision should be inoperative. The agreement, of course, likewise prescribed certain wage scales and working conditions, but we are not here concerned with such.

In the first paragraph of the second count of the complaint the plaintiffs describe Blaw-Knox and King McCreery as

being large scale contractors doing business on a nation-wide basis; it is alleged that they employ large numbers of sheet metal workers who are members of the International Union, and that it is necessary for them to maintain peaceful relations and cooperation with the said International Union and the members thereof; that both Blaw-Knox and King McCreery have executed agreements with the International Union covering the operation of the business of each throughout the country; that until March 2, 1953, the defendant unions furnished workers for jobs contracted by the plaintiffs and also furnished workers to Blaw-Knox and King McCreery upon request, which workers were paid the wage scale contained in the agreement between the Union Employers' Section, Sheet Metal Contractors Association of Arkansas, Inc. and the Local Union, which has been abstracted above, plus a "subsistence allowance of $3.75 per day". It is further alleged that since March 2, 1953, the defendant, Eilmes, and the unions and members thereof have caused employees of the plaintiffs, who are members of the unions, to refuse to work for the plaintiffs, and have failed and refused to supply workmen for the plaintiffs, and have caused the businesses and certain jobs of the plaintiffs to be picketed; it is further alleged, however, that at all times the unions have furnished workers to Blaw-Knox and King McCreery under the same wages and working conditions as called for by said agreement, with the understanding, however, "that all employees who are members of defendant unions would be paid retroactively any increase in wages and benefits negotiated with and obtained from the plaintiffs and other sheet metal contractors in this area". It is further alleged that on March 2, 1953, and subsequently all union employees of the plaintiffs "were sent to and employed by the defendants, Blaw-Knox Company and King McCreery. * * *"

In the second paragraph of Count II it is alleged that during the latter part of 1952 and "up to and including the present time" Blaw-Knox and King McCreery "wilfully, maliciously and unlawfully conspired with, aided, abetted and caused the defendant E. P. Eilmes and the defendant unions and the members thereof to breach and to attempt to force and coerce plaintiffs to abandon their rights under the said lawful and existing collective bargaining agreement between plaintiffs and the defendant unions and to interfere with and damage plaintiffs in their business". The parties to the conspiracy are identified, upon information and belief, as follows: Representing Blaw-Knox, one W. F. O'Neill, "his subordinates and others unknown to plaintiffs"; representing King McCreery, himself, "his subordinates and others unknown to plaintiffs"; representing the unions and their members, Robert Byron, President of the International Union, E. P. Eilmes, International Representative of the International Union and a representative of the Local Union, W. W. Rogers, Financial Secretary of the Local Union, together with their subordinates and other unknown persons.

In the same paragraph the plaintiffs set out a number of overt acts which the defendants are alleged to have "committed", "caused", and "induced", and in the commission of which it is further alleged that the defendants aided and abetted. The first overt act alleged is that the defendant unions and members and the defendant, Eilmes, caused employees of the plaintiffs to fail to report to work for the plaintiffs on March 2, 1953, and subsequently to refuse to work for the plaintiffs. The second overt act is that the defendant unions and the members thereof, and Eilmes, have failed and refused to furnish qualified workers to the plaintiffs as required by the agreement. A further allegation is that the defendant unions, their members, and Eilmes have caused members of the union to engage in an unofficial strike on all jobs carried on by the plaintiffs in violation of the agreement. The fourth overt act alleged is that the defendant unions, their members, and Eilmes have caused the businesses and certain jobs of the

plaintiffs to be picketed. The final overt act charged is that Blaw-Knox and King McCreery have hired union members in connection with the construction of the arsenal, which members had prior to March 2, 1953, worked for the plaintiffs, "in such numbers and at such compensation as were not reasonably necessary or required for the construction of said * * * Arsenal project".

Each plaintiff claims as actual damages the same amount claimed under the first count of the complaint, and in addition each plaintiff claims punitive damages in an equal sum. Since there is no prayer in the second count for any tort damages against the local union, and since the prayer for tort damages against the International Union is purely alternative to the contract claim, it is obvious that the second count is primarily directed against Blaw-Knox and King Mc-Creery.

The defendant unions attack the first count of the complaint upon several grounds, but their principal contention is that since the plaintiffs were not signatory parties to the collective bargaining agreement, they cannot maintain this action under the provisions of 29 U.S.C.A. § 185(a)[3], and that this Court has no jurisdiction, there being no diversity of citizenship between the plaintiffs on the one hand and the unions on the other. The view which we take of the case renders it unnecessary for us to consider the other contentions made by the unions in support of their attack upon the first count.

With respect to jurisdiction, the plaintiffs concede that their right to maintain the first count in this Court depends upon the availability to them of the special jurisdiction conferred by Section 185(a); in this connection, they recognize the well-settled principle that in actions brought by or against an unincorporated association in Federal Court the citizenship of the association for jurisdictional purposes depends upon the respective citizenships of the several members of the association, and that no diversity exists where, as here, any one or more of the members of the association is a citizen of the same state as one or more of the association's adversaries. Under this principle the first count could could not be maintained here upon the basis of diversity since it does not exist; but if the plaintiffs can sue under Section 185(a), the absence of diversity is not material.

To sustain their claim of jurisdiction under Section 185(a), the plaintiffs contend that they are "employers" within the meaning of said Section, and that they are actually parties to the collective bargaining agreement which was executed by the Union Employers Section, Sheet Metal Contractors Association of Arkansas, Inc., hereinafter called the Association; in this connection they argue that the Association was simply an agent for them and other contractors similarly situated, that they and other operating contractors were the real parties to the contract, and that this was fully disclosed to and understood by all concerned. Alternatively, they contend that they are at least third-party beneficiaries of said contract, and that third party beneficiaries can sue under Section 185(a). The unions contend, on the other hand, that the jurisdiction conferred by Section 185(a) is limited to disputes between the formal signatory parties to a collective bargaining agreement, and that since the plaintiffs did not sign the contract, and, at best, are but third-party beneficiaries, their action cannot be maintained here. With reference to the

3. This statute, which will hereinafter be referred to simply as Section 185(a), reads as follows: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

alternative theories of the plaintiffs, it is recalled that when the question of the jurisdiction of this Court was first raised, counsel for the plaintiffs in their original brief stated that the status of the plaintiffs was that of third-party beneficiaries; it was not until the proceedings had reached a later stage that plaintiffs advanced the contention, upon which they now principally rely, that they were actually parties to the contract.

■ We find it unnecessary to definitely characterize the plaintiffs' relationship to the collective bargaining agreement, since, whatever such relationship may have been, we are unable to perceive any valid distinction between it and the relationship borne to said contract by the individual employees for whose benefit it was negotiated by the union or unions. It has been uniformly held in the comparatively few cases in which the question has arisen that individual employees may not maintain a suit under Section 185(a); United Protective Workers of America v. Ford Motor Co., 7 Cir., 194 F.2d 997; Schatte v. International Alliance, etc., D.C.Cal., 84 F.Supp. 669; Brooks v. Hunkin-Conkey Construction Co., D.C.Pa., 95 F.Supp. 608. As stated, we see no distinction between an employee who is a member of a labor union and an employer who is a member of an employer's association as far as the right to sue under Section 185(a) is concerned, and while we are not bound by the decisions just cited, we do not feel justified in refusing to follow them, particularly since one of them was rendered by a Federal Appellate Court; moreover, no case holding to the contrary has been cited to us, and we have found no such case.

■ Neither Rabouin v. National Labor Relations Board, 2 Cir., 195 F.2d 906, nor Lewis v. Cable, D.C.Pa., 107 F.Supp. 196, both cited by the plaintiffs, is in point here since neither involved any question of federal jurisdiction under Section 185(a); they hold, at most, that where an employer who is a member of an employers' association accepts the benefits of and operates under a collective bargaining agreement negotiated by such association, he becomes a party by estoppel to such contract and is bound by its terms; but jurisdiction cannot be conferred upon this Court by estoppel. Moreover, with special reference to the Rabouin case, it is noted that there it was intended that each individual employer should sign the contract, and separate copies were prepared and circulated among the several members of the association for their signature. Such is not the case here.

Counsel for the plaintiffs have cited Isbrandtsen Co. v. Local 1291, etc., 3 Cir., 204 F.2d 495, in support of their contention that a third-party beneficiary may sue under the statute, and there is some language in the opinion of the Court tending to sustain said contention.[4] But the Court was not called upon to decide the question and expressly refrained from so doing. Moreover, the language referred to is somewhat weakened in our eyes by the Court's reference to Marranzano v. Riggs National Bank, 87 U.S. App.D.C. 195, 184 F.2d 349, which the Court apparently thought supported the view that a third-party beneficiary could sue. The facts in the Marranzano case were that a former bank employee, a citizen of the District of Columbia, brought suit in the District Court of the United States for the District of Columbia, against the bank and certain other defendants, all citizens of the District, alleging a breach of a collective bargaining agreement. The trial court took the position that in the absence of a specific provision in the contract allowing suits thereon by individual employees, the latter could not sue; this view was held erroneous by the Court of Appeals, al-

---

4. The language referred to is as follows: " * * * All the statute talks about is a suit for violation of the contract; it does not say who may or who may not sue. The legislative history cited by the appellee is certainly inconclusive with regard to the rights of those not signatory to the contract, * * *." 204 F.2d at page 496.

though the decision was affirmed on other grounds. One cannot tell from reading the published opinion of the Court of Appeals whether jurisdiction was predicated upon the Taft-Hartley Act or not; but we have obtained a certified copy of the complaint from which it appears that the statutory jurisdiction was not invoked, but simply the general jurisdiction of the District Court for the District of Columbia, which is not only a "federal court" in the ordinary sense of the term but is also a court of general jurisdiction in cases involving more than $3,000. 1 Barron & Holtzoff, Federal Practice & Procedure, Section 40 and cases there cited. While the complaint in the Marranzano case did not allege any diversity of citizenship, it did allege an amount in controversy in excess of $3,000, which would have been an unnecessary allegation had the Taft-Hartley jurisdiction been invoked; there was no reference to said Act in the complaint.

■■ From the foregoing it follows that the first count must be dismissed for want of jurisdiction. We do not mean to be understood, however, as holding that employers do not have a right to utilize associations of their own as bargaining agents, or that they necessarily debar themselves from the right to invoke the jurisdiction conferred by Section 185(a) simply because they use such an association to negotiate a collective bargaining agreement. There would seem to be no question that if such a contract is actually executed by the several employers represented by the association, each employer would have the right to sue under the statute; this was not done in the instant case, however; here the several operating employers permitted their association, which is a corporation having a legal identity of its own, not only to negotiate the contract but also to execute it in its own name. Neither do we mean to be understood as holding that the plaintiffs have no substantive rights under the contract which they are entitled to enforce in a proper forum; the question before us on this phase of the case is simply whether or not the plaintiffs can enforce their rights under the contract in this court in the absence of diversity of citizenship; and we conclude that they cannot do so.

Taking up now the second count of the complaint, we cannot agree with the defendants named therein that said count is fatally defective for any of the several reasons urged by them, or for any other reason; and we are satisfied that said Count should be upheld. Before attempting to state and discuss the specific contentions made in connection with said Count, we deem it well to briefly call attention to certain general principles of law which we think are applicable thereto:

■■ Since our jurisdiction of Count Two is predicated solely upon diversity of citizenship and an amount in controversy in excess of $3,000, the governing law is that of Arkansas. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188. Under Arkansas law a malicious and willful interference with the contractual rights and relationships of another is an actionable tort. Mahoney v. Roberts, 86 Ark. 130, 110 S.W. 225; Johns v. Patterson, 138 Ark. 420, 211 S.W. 387; Hogue v. Sparks, 146 Ark. 174, 225 S.W. 291. With respect to civil liability for conspiracy, the Arkansas law is well summarized in the case of Stewart v. Hedrick, 205 Ark. 1063, 1068, 172 S.W.2d 416, 418, where the Court said: "The law applicable to the case was stated in the opinion in Wilson v. Davis, 138 Ark. 111, 211 S.W. 152, where it was said that a conspiracy may be inferred although no actual meeting of the parties is proved, if it be shown that two or more persons pursued by their acts the same unlawful purpose, each doing a part, so that their acts, though apparently independent, were in fact connected; and that when such an unlawful agreement is entered into the parties become liable as joint tort-feasors to the extent of the damage done as a result of the conspiracy, and the liability of a particular conspirator does not depend upon

the extent to which he profited or his activity in promoting the conspiracy." Another principle of law with which we are here concerned is that, generally speaking, an unincorporated association is liable for the tortious acts of its agents committed in the prosecution of the association's business. 4 Am. Jur., Associations & Clubs, § 43; 7 C. J.S., Associations, § 16. While we have found no Arkansas cases on this point, we have no reason to believe that the Arkansas law differs in this respect from that prevailing elsewhere; it is a settled principle of Arkansas law, however, that an unincorporated association cannot be sued as an entity; the individual members must be made parties. District No. 21, United Mine Workers of America v. Bourland, 169 Ark. 796, 277 S.W. 546; Baskins v. United Mine Workers of America, 150 Ark. 398, 234 S.W. 464; Lewelling v. Manufacturing Wood-Workers' Underwriters, 140 Ark. 124, 215 S. W. 258.

It should be further pointed out that in Count Two of the complaint the plaintiffs are not suing the International Union as such; rather, they are attempting to sue the members of said Union by means of a class action under Rule 23 of the Federal Rules of Civil Procedure; the reason for the plaintiffs' utilization of this device is that in a class action in determining diversity the citizenship of the member or members of the class made a party or parties to the suit governs; the citizenship of other members of the class is ignored. 2 Barron & Holtzoff, op. cit., Section 569, page 176. Hence, if the plaintiffs can maintain their class suit against the members of the International Union by suing Eilmes, a citizen of Washington, as a member of the class, the jurisdictional obstacle created by the fact that many members of said Union are citizens of Arkansas will have been overcome.

With these principles in mind we now consider the several arguments made by the defendants in support of their attacks on Count Two.

It is first urged by the International Union that the provisions of Section 301(b) of the Taft-Hartley Act, 29 U.S.C.A. § 185(b), to the effect that a labor organization representing employees in an industry affecting interstate commerce "may sue or be sued as an entity * * *" has had the effect of abolishing the class action as a means of suing a labor union; otherwise stated, the International Union would have us equate the word "may", which is used in the statute, and which is purely permissive, with the word "must", which, of course, is mandatory, and which does not appear in the statute. We do not agree; the same question was before Judge Rifkind in Tisa v. Potofsky, D.C.N.Y., 90 F.Supp. 175, and he decided it adversely to the International's contention here; he said:

"* * * There is no inconsistency in permitting unions to sue and be sued in their common names and at the same time allowing them to sue and be sued by the device of the class action. Cf. Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, 4 Cir., 1945, 148 F.2d 403.

"As this case indicates, the class suit continues to serve a useful function. If the class suit is to be considered abolished in this field, it can be only because of the clearly expressed mandate of Congress. I do not find such an intention in the language of 29 U.S.C.A. § 185(b). In fact, the language used is expressly permissive; 'may sue or be sued as an entity * * *.' To support their interpretation, defendants must rely primarily on the provision requiring that judgments be enforceable only against the assets of the entity and not of the individual members. But a limitation on the enforcement of judgments against unions does not support the conclusion that Congress intended to abolish the class action by and against unions.

"I reject defendants' interpretation of the Labor-Management Relations Act, and regard the class action as still available. The decision in Schatte v. International Alliance, * * *, cited by the defendants, does not conflict with this conclusion. To the extent that its dicta are inconsistent with the views here expressed, I find myself unable to follow it." 90 F.Supp. at page 180.

We are in accord with Judge Rifkind's views as expressed in the case just cited.[5]

■ The International Union next contends that even if the class action can still be used as a device to sue labor unions under certain circumstances, the instant claim against the membership of the International cannot be maintained by such device. Again, we are unable to agree. Rule 23(a) (1) of the Federal Rules of Civil Procedure provides: "If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is (1) joint, or common, or secondary in the sense that the owner of a primary right refuses to enforce that right and a member of the class thereby becomes entitled to enforce it; * * *." In our

opinion the right of the plaintiffs to sue the membership of the International Union by means of a class suit against the defendant, Eilmes, is established both by the text of the Rule itself, and also by the decision of the Court of Appeals for this Circuit in Montgomery Ward & Co. v. Langer, 8 Cir., 168 F.2d 182.

As we understand the allegations of the plaintiffs' complaint, the latter contend that one or more agents of the International, including Eilmes, conspired with the Government contractors and with representatives of the Local Union to bring about a breach of the collective bargaining agreement, and procured its breach accompanied by a strike and the picketing of the businesses of the plaintiffs; the liability of the membership of the International is predicated solely upon the actions of its representatives; we do not understand that it is contended by the plaintiffs that all of the individual members of the International throughout the country participated in the tortious actions of which the plaintiffs complain. As we have already pointed out, an unincorporated association, which is simply another way of saying the individual members thereof, is liable upon principles of agency for the tortious conduct of its agents carried out in the prosecution of the association's business, and that is the liability which the plaintiffs are asserting against the membership of the Interna-

---

5. We do not overlook the fact that in Rock Drilling, etc., Local Union No. 17 v. Mason & Hangar Co., D.C.N.Y., 90 F. Supp. 539, 542, Judge Rifkind said: "* * * the gist of the statute (Section 185(b) is to dispense with the class suit device which has been used in order to overcome the common law mandate (that all members of an unincorporated association must join or be joined in actions by or against the association)." That case was decided only one month and two days after the decision in Tisa v. Potofsky, supra, and no mention is made in the opinion of the earlier decision; the question before the Court in the later case was not the continued existence of the class suit device in labor cases, but whether or not a la-

bor union could sue as a quasi trustee for its members to recover for wrongs done to them by their employer not amounting to a breach of a collective bargaining agreement. We do not feel that Judge Rifkind would have overruled himself on the question of the continued availability of the class suit in labor cases in so short a period of time, or that he would have done so without even referring to his earlier opinion; we feel that what he meant was that the statute had dispensed with the *necessity* of the class suit in actions by or against labor unions. But, be that as it may, we are in agreement with the view expressed in Tisa v. Potofsky and adhere to it.

tional in the second count of the complaint. The rights which the plaintiffs seek to enforce against the members of the class are joint or common to all; all of the members of the Union are equally concerned in defending against the plaintiffs' claims, and there is no conflict of interest between the individual members of the Union; questions of the guilt or innocence of individual union members, as members of the Union, are not here involved. This is sufficient to distinguish the instant case from U. S. v. E. I. DuPont de Nemours & Co., D.C. Ill., 13 F.R.D. 98, which is cited by the International, and in which the Government undertook to maintain a class action against certain members of the DuPont family, who were alleged to have conspired to restrain and monopolize interstate trade, by suing three members of the family who were also alleged to be conspirators; the view was taken that the guilt or innocence of a given conspirator was an individual matter and that the named defendants could not fairly defend as to each of the class members "since the fact of participation in a conspiracy is individual." 13 F.R. D. at page 101. As a matter of fact, the holding in that case at least militates against the argument made by the International that the only way in which the plaintiffs could maintain a class action against the members of that Union would be to allege facts showing that each member of the Union participated in the alleged torts.

In Montgomery Ward Co. v. Langer, supra, it was held that the membership of an international union composed of several thousand members and the membership of a local union composed of several hundred members could be sued for libel by means of a class action. Counsel for the International contend that the complaint in that case alleged in effect that all of the union members joined in publishing the libels, and, fur-

ther, that the class which was sued was really the publishers of the libel rather than the union members, and that the Court gave controlling importance to those factors. There is nothing in the opinion which indicates that the class sued was other than the members of the Union, and it seems unreasonable to us to suppose that the Court thought that anyone had intended to allege that several thousand people had all actually participated in the publication of the libels complained of; nor is there anything in the language of the Court which indicates that it felt that a class action could be used against a labor union in a tort case only where all of the members participate in the actual commission of the tort. On the other hand, as stated, the decision in the DuPont case, supra, indicates that where the members of the class are each charged with having participated in the actual commission of the tort, a class suit may be improper.

 In accord with the views here expressed is Pascale v. Emery, D.C. Mass., 95 F.Supp. 147, which was also a libel suit brought as a class action against certain named defendants as representatives of the memberships of an international and a local union; it is clear from that decision that it was not alleged or contended that each union member had participated in the publication of the libel, and it was there held that the action was maintainable as a true class suit.

It is contended by all of the defendants named in Count Two that said count fails to state a claim upon which relief can be granted in that it does not set forth the alleged conspiracy with sufficient particularity, that is to say, that it does not set forth the facts of the conspiracy or facts and circumstances from which the existence of a conspiracy can be inferred.[6] In taking up this contention it must be borne in mind that when a complaint is attacked by motion

---

**6.** A conspiracy to interfere with contract relations is actionable where it results in damage. 11 Am.Jur., Conspiracy, Section 50; see also Mahoney v. Roberts, supra, 86 Ark. 130, 110 S.W. 225, and annotation in 84 A.L.R. 43, 98–100.

to dismiss for failure to state a claim upon which relief can be granted, we are required to view the case in the light most favorable to the plaintiff and most unfavorable to the defendants; we accept as true all well-pleaded allegations of fact contained in the complaint and all inferences which may be reasonably drawn from the facts alleged; and we do not dismiss the complaint if it can be reasonably conceived that the plaintiffs upon a trial can make a case which would entitle them to some relief. Montgomery Ward & Co. v. Langer, supra; 1 Barron & Holtzoff, op. cit., Sections 348 and 350.

 Assuming, as the defendants contend, that a mere general allegation of a conspiracy followed by overt acts is merely a statement of a conclusion of the pleader and is insufficient to state a claim upon which relief can be granted, and that in a civil action for damages resulting from a conspiracy the plaintiff is required to aver the facts and circumstances which constitute the conspiracy, or from which it may be inferred, see 15 C.J.S. Conspiracy, § 25, pages 1038–1039; Black & Yates v. Mahogany Ass'n, 3 Cir., 129 F.2d 227, 148 A.L.R. 841; Morse v. Lewis, 4 Cir., 54 F.2d 1027; Ransom v. Matson Navigation Co., D.C. Wash., 1 F.Supp. 244,[7] we are of the opinion that when the second count of the complaint is given the liberal construction which we are required to give it for the purposes of the instant motions, it meets the tests prescribed by the authorities just cited. Whether the plaintiffs can prove their allegations is, of course, another question, and is one with which we are not presently concerned.

The first paragraph of the second count alleges with considerable detail the size and scope of the operations of Blaw-Knox and King McCreery, their constant need for large numbers of skilled workers, the necessity which they are under for close cooperation and harmonious relationships with the International Union, and their recognition of this necessity by the execution by them of collective bargaining agreements with the International. Said paragraph further alleges that prior to March 2, 1953, the defendant unions supplied sheet metal workers both to the plaintiffs and to Blaw-Knox and King McCreery, and that the latter paid the wage scales set forth in the contract plus a daily subsistence allowance of $3.75[8]; it is further alleged that since March 2, 1953, the unions have supplied no workers to the plaintiffs and have caused the businesses and certain jobs of plaintiffs to be picketed, but that since said date the unions have continued to furnish workers to Blaw-Knox and King McCreery, and that the latter have paid

7. Both Morse v. Lewis and Ransom v. Matson Navigation Co., supra, were decided prior to the effective date of the Federal Rules of Civil Procedure. How Black & Yates v. Mahogany Association would square with Rule 8(a) (2), which requires that a complaint contain a "short and plain statement of the claim", if critically examined, we do not stop to inquire. In Picking v. Pennsylvania R. Co., 3 Cir., 151 F.2d 240, 252–253, the Court upheld a conspiracy complaint against a motion to dismiss, which complaint was obviously drawn in rather general terms. In Luebke Co. v. Manhardt, D.C.Wis., 37 F.Supp. 13, 14, the Court in passing upon a motion for a more definite statement and for a bill of particulars said: "In actions to recover damages for alleged unlawful conspiracy, owing to the complicated nature of the case and the numerous elements which enter into such conspiracy, the plaintiff should be given liberal latitude in his pleadings. * * * It is inherent in this kind of action that all of the details and specific facts relied upon cannot properly be set forth as a part of the pleadings. The court should concern itself, on a motion for a bill of particulars, only to the extent that the defendants may not be subjected to surprise and should have a reasonably accurate knowledge of the basis for the plaintiff's claim."

8. Section 3 of Article V of the Agreement provided for the payment of a subsistence allowance of $3.80 per day to workers employed outside of Greater Little Rock.

the wages and observed the working conditions prescribed in the contract with the understanding, however, that all employees who are members of the defendant unions will be paid retroactively any increase in wages and benefits which may be negotiated and obtained from the plaintiffs and other sheet metal contractors in the area. Said paragraph alleges finally that on March 2, 1953, and subsequently "all employees of the plaintiffs who are members of the defendant unions were sent to and employed by the defendants Blaw-Knox Company and King McCreery. * . * * "

In the second paragraph of this count it is affirmatively alleged that Blaw-Knox and King McCreery "wilfully, maliciously and unlawfully conspired with, aided, abetted and caused the defendant E. P. Eilmes and the defendant unions and the members thereof to breach and to attempt to force and coerce plaintiffs to abandon their rights under the * * existing collective bargaining agreement * * * and to interfere with and damage plaintiffs in their businesses." Plaintiffs then go on to identify the various parties to the alleged conspiracy to the best of their knowledge and belief, and finally allege the commission of the overt acts which have been heretofore described, the final overt act alleged being the employment by Blaw-Knox and King McCreery of sheet metal workers, former employees of the plaintiffs, in unnecessary numbers and for unreasonable compensation.

 While the allegation of "conspiracy" quoted above may be simply a conclusion, nevertheless it is aided by the other allegations, and when all of the allegations are read together, we consider them adequate to charge the defendants with having disrupted the employment relationships existing between the plaintiffs and their individual employees and enjoyed by the former under the collective bargaining agreement and with having caused the breach of said agreement to the substantial damage of the respective plaintiffs, and that this was done pursuant to a pre-conceived plan, the object of which is alleged to have been to force the plaintiffs to abandon their rights under the contract, to deprive them of the services of their employees who were union members, and to interfere with and damage them in their businesses. We do not think that more is required. It is well settled that even in a criminal case it is not necessary for the indictment to allege all of the details of the conspiracy or all of the means and methods whereby it was to be carried into effect, or the evidence upon which the prosecution intends to rely; *a fortiori* such a requirement should not be made in a civil case. Moreover, as has been pointed out, under Arkansas law it is not necessary for the plaintiff in an action for conspiracy to prove an express agreement between the conspirators, or the activities of each particular conspirator, or the profit or advantage derived by each as a result of his participation in the unlawful combination.

 It is urged on behalf of Blaw-Knox and King McCreery that the allegations of the second count with respect to them relate to such innocuous transactions that no reasonable inference of a conspiracy can be drawn therefrom. There might be force to this argument if each allegation were to be considered by itself; but they cannot be so considered; they must be read together, and when so read, we feel that a jury might well find, if said allegations are proven, that there was concerted action on the part of the Government contractors and the Unions looking toward the breach of the collective bargaining agreement. Of course, no invidious inference can be drawn from the mere fact that the Government contractors are large operators, or from the mere fact that they constantly need and employ large numbers of workers, or from the mere fact that they maintain pleasant relationships with the International Union and have collective bargaining agreements with it, or from the mere fact that workers were supplied to them after the union or unions had ceased

supplying them to the plaintiffs, or from the mere fact that they hired former employees of the plaintiffs the day after the contract is alleged to have been breached. But when all of these "mere facts" are taken together, each lends color and significance to the other, and the overall picture presented is not so innocent, or at least a jury might find that it is not. Under these allegations it would not be unreasonable for the triers of the facts to infer that it was not mere coincidence that union men were supplied to the Government contractors rather than to the local plaintiffs, and that it was not coincidence that on the very day upon which it is alleged that the contract was breached, and upon which it is alleged that the individual employees of the plaintiffs were caused to quit their employment, the Government contractors hired union members, former employees of the plaintiffs, "in such numbers and at such compensation as were not reasonably necessary or required for the construction of said Pine Bluff Arsenal Project". The jury might well conclude that the need for workers on the part of the Government contractors supplied a motive for the latter to conspire to deprive the plaintiffs of their labor and to bring about the breach of the contract under which the union or unions were required to furnish men for jobs contracted by the plaintiffs, and that an agreement, express or implicit, was made to the effect that if the contract should be breached, and if employees of the plaintiffs should quit their jobs and refuse to work further for the plaintiffs, such former employees would not lose any work but would be immediately employed by the Government contractors in unnecessary numbers and at unreasonable rates of compensation. Such an agreement would supply a motive to the unions and to the employees to become parties to the scheme; and if in fact the defendants named in Count Two did enter into such a conspiracy as is alleged by the plaintiffs, it seems obvious that the immediate hiring of the men who quit the employ of the plaintiffs would be an essential part of such conspiracy and necessary to carry it into effect. See Falstaff Brewing Corp. v. Iowa Fruit & Produce Co., 8 Cir., 112 F.2d 101, 108.

 But even if it be said that the second count fails to allege an actionable conspiracy, it does not follow that the count should be dismissed. Said count does more than charge a conspiracy followed by overt acts resulting in damage to the plaintiffs; its language is conjunctive and it charges not only that the defendants entered into a conspiracy but also that the defendants "committed, caused, induced, and aided and abetted the commission" of the overt acts which have been described, and which included the alleged breach of Article III of the Agreement, which Article obligated the union or unions to supply men for the plaintiffs' jobs, and which also included the alleged actions of the unions and of Mr. Eilmes in causing the individual employees of the plaintiffs to quit their jobs and to refuse to work further for the plaintiffs. The alleged actions of the defendants in causing and inducing the breach of the contract and in causing and inducing the individual employees to terminate their employment with the plaintiffs were in themselves actionable torts,[9] whether committed in furtherance of a conspiracy or not; see Mahoney v. Roberts; Johns v. Patterson; Hogue v. Sparks, all supra; 52 Am.Jur., Torts, Sections 42–43; and see the extensive annotation on the subject in 84

9. We attach no controlling significance to the charge that the defendants named in Count Two, particularly the Government contractors, "aided and abetted" the breach of the contract and the disruption of the relationships between the plaintiffs and their employees since there is a conflict in authority as to whether one who merely aids and abets a breach of contract is liable for his actions. This renders it unnecessary for us to consider the argument advanced by counsel as to the meaning to be given to the quoted phrase.

A.L.R. p. 43 et seq. Where a complaint alleges an actionable tort, additional allegations that such tort was committed pursuant to a conspiracy actually add nothing to the complaint; such allegations are merely allegations of matters of inducement or evidence, and, if defective, may be ignored and a trial had upon the substantive tort alleged. Barry v. Legler, 8 Cir., 39 F.2d 297; State of Missouri ex rel. and to Use of De Vault v. Fidelity & Casualty Co. of New York, 8 Cir., 107 F.2d 343; Original Ballet Russe, Ltd., v. Ballet Theatre, Inc., 2 Cir., 133 F.2d 187. Hence, even if we believed, as we do not, that the conspiracy allegations are defective, the principle just stated would be applicable, and we would not be justified in dismissing Count Two. It is, of course, possible that the plaintiffs may encounter difficulty in proving at least some of the allegations in Count Two, but we believe that under the law they should have the opportunity of so doing.

The argument is advanced by the Government contractors that the collective bargaining agreement is violative of the so-called "Freedom to Work" Amendment to the Constitution of Arkansas, Ark.Const. of 1874, Amendment 34, and the statute adopted by the Arkansas Legislature in 1947 implementing said Amendment, Act 101 of 1947, Ark.Stats.1947, § 81–201 et seq. This amendment and statute make "closed shop" contracts illegal and prohibit certain practices formerly prevalent in industry. The Government contractors contend that this contract was, in effect, a "closed shop" contract, and, as such, illegal, and that, therefore, no actionable tort would be committed in procuring its breach or in entering into a conspiracy with that object in view. We do not agree. The contract with which we are concerned contains no provision for a closed shop, a union shop, a check-off of dues, or any other provision which is repugnant to the aforementioned constitutional provision or statute. Moreover, the contract specifically provides that any portion thereof which is viola-

tive of any valid state or federal law shall be inoperative. In passing upon these motions we cannot go beyond the complaint and the contract, and we can see nothing in them from which any illegality can be inferred; we disagree with counsel for the Government contractors in their contention that the agreement of the union, set forth in Article III of the contract, "to furnish at the request of the Employer, duly qualified journeymen sheet metal workers and registered apprentices in sufficient numbers as may be necessary to properly execute work contracted for by the Employer in the manner and under the conditions specified in this Agreement", amounted to a stipulation for a closed or union shop; but even if it did, the validity of the contract as a whole would probably be saved by the provision above referred to which renders inoperative any illegal portion of the contract; see N.L.R.B. v. Rockaway News Supply Co., 345 U.S. 71, 78–81, 73 S.Ct. 519; certainly said provision should be given that saving effect for purposes of the instant motions; we have no right to presume that the parties to this agreement intended to violate or circumvent the law, or that the contract did not mean what it said. Nor do we attach any significance to the fact that Article II of the Agreement provided the Agreement should cover the rates of pay, rules and working conditions of "all employees of the Employer * * *", since it is familiar law that under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., a union certified as the collective bargaining agent of employees represents all employees, whether union members or not.

The cases cited by the Government contractors in this connection are readily distinguishable from the instant case. In Lewis v. Jackson and Squire, D.C. Ark., 86 F.Supp. 354, the contract which was before Judge Miller contained an express provision to the effect that as a condition of employment all employees should be or become members of the union. In Self v. Taylor, 217 Ark. 953,

235 S.W.2d 45, the contract contained an optional termination clause, quite different from the termination provisions of the contract before us, and it was found by the Court upon a plenary trial on the merits that it was the intention of the union to so utilize the termination provisions of the contract as to compel the employer to hire only union members.

As heretofore stated, we are of the opinion that Count One of the complaint should be dismissed for lack of jurisdiction, but that the motions of the defendants to dismiss Count Two should be overruled. An order to that effect will be entered.